B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS ROBERT YAQUINTO, JR., TRUSTEE | DEFENDANTS KRAGE & JANVEY, LLP |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.) Michael Justin Lang Crawford, Wishnew & Lang PLLC 1700 Pacific Avenue, Suite 2390 Dallas, Texas 75201 Telephone: (214) 817-4500 | ATTORNEYS (If Known) John P. Lewis Hayward PLLC 10501 N. Central Expressway, Suite 106 Dallas, Texas 75231 Telephone: (972) 755-7106 |
|---|---|

| PARTY (Check One Box Only) □ Debtor   □ U.S. Trustee/Bankruptcy Admin □ Creditor   □ Other ☑ Trustee | PARTY (Check One Box Only) □ Debtor   □ U.S. Trustee/Bankruptcy Admin □ Creditor   ☑ Other □ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Amended Complaint - Actual Fraudulent Transfer Tex. Bus. Comm. Code § 24.005(a)(1) through 11 U.S.C. § 541 & 544, and 11 U.S.C. § 548(a)(1) (A); Constructive Fraudulent Transfer Tex. Bus. Comm. Code § 24.005(a)(2) through 11 U.S.C. §541 & 544, and 11 U.S.C. § 548(a)(1)(B); Preferences 11 U.S.C. § 547; Recovery of Avoided Transfers 11 U.S.C. § 550; Money Had and Received/Unjust Enrichment; Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty; Professional Negligence/Malpractice; Negligent Retention/Supervision; and Disallowance of Claims 11 U.S.C. § 502(b) and (d).

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- [ ] 11-Recovery of money/property - §542 turnover of property
- [☑] 12-Recovery of money/property - §547 preference
- [☑] 13-Recovery of money/property - §548 fraudulent transfer
- [☑] 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- [ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- [ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- [ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- [ ] 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- [ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- [ ] 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- [ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- [ ] 61-Dischargeability - §523(a)(5), domestic support
- [ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
- [ ] 63-Dischargeability - §523(a)(8), student loan
- [ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- [ ] 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- [ ] 71-Injunctive relief – imposition of stay
- [ ] 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- [ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- [ ] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- [ ] 01-Determination of removed claim or cause

**Other**
- [ ] SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- [☑] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ More than $1,000,000.00 |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Texas E&P Operating, Inc. | BANKRUPTCY CASE NO.<br>17-34386-SGJ-7 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G.C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>December 9, 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Michael Justin Lang | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Michael Justin Lang
Texas Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
aohlinger@cwl.law
Texas Bar No. 24091423
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Avenue, Suite 2390
Dallas, Texas 75201
(214) 817- 4500

***Attorneys for Ch. 7 Trustee***
***Robert Yaquinto, Jr.***

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| IN RE:<br><br>TEXAS E & P OPERATING, INC.,<br><br>　　　　　　Debtor. | CASE NO. 17-34386-SGJ-7<br><br>CHAPTER 7 |
| ROBERT YAQUINTO, JR.,<br><br>　　　　　　Trustee,<br><br>v.<br><br>KRAGE & JANVEY, LLP,<br><br>　　　　　　Defendant. | ADV. PROC. NO. 19-03231-SGJ |

### TRUSTEE'S FIRST AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Robert Yaquinto, Jr., as Chapter 7 Trustee ("Trustee" or "Plaintiff") of Texas E&P

Operating, Inc. ("Debtor"), files this *First Amended Complaint* (the "Amended Complaint")

against Defendant Krage & Janvey, LLP ("Krage & Janvey" or "Defendant"). In support thereof,

Trustee respectfully shows the Court as follows:

## I.  INTRODUCTION

1.      Mark Plummer ("Plummer") sold unregistered, private placement interests in various oil and gas drilling ventures (the "Ventures"). Debtor was the purported "operator" entity for the Ventures. Debtor conducted and had full control of drilling operations for each venture and paid upfront expenses in such development and operation. Under the operating agreements, the joint ventures (*i.e.*, the investors) agreed to reimburse Debtor for their respective share of the operating expenses.

> **C.   Payments and Accounting:**
>
> Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.
>
> Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

2.      On June 9, 2022, Plummer was indicted for *theft, money laundering, and securities fraud* in connection with three of those "ventures:" Salmon 2W, Beeler 1H, and Beeler 2H.[1] A Grand Jury in Collin County, Texas determined that, from May 1, 2015 through September 18, 2020, Plummer engaged in a "scheme and continuing course of conduct" to defraud investors.[2]

---

[1] The indictments are attached to the Amended Complaint as **Ex. 1**.
[2] *Id.*

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                        **PAGE 2**

Specifically, the Grand Jury indicted Plummer for defrauding more than 170 investors out of over $10 million.[3] Notably, to perpetrate this fraud and create the appearance of a legitimate oil and gas business, Plummer saddled Debtor, who was insolvent by 2013, with the over $30 million in creditor claims that were filed in this Bankruptcy Case against Debtor.

3.     Importantly, Plummer did not act alone in harming Debtor. This specific lawsuit arises out of the fact that, at all relevant times, the law firm of Krage & Janvey charged Debtor for legal "services" that ultimately helped Plummer perpetuate his fraud and ensure Debtor's bankrupt fate.[4]

4.     Over the years, Krage & Janvey was put on repeated notice that: (1) Plummer's fundraising activities were fraudulent; and (2) Plummer was setting up the increasingly insolvent Debtor to be

---

[3] Specifically, $10,245,000. *See id*.

[4] *See Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881, at *2 (N.D. Tex. Dec. 17, 2014) ("At root, Plaintiffs allege Defendants contributed to the success and eventual downfall of the Stanford Ponzi scheme through the provision of deficient legal services.").

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                                                 **PAGE 3**

holding the bag of debt at the end. For example, in *2010*, an attorney for an investor in the Ventures made highly specific allegations to Krage & Janvey—capable of being controverted, *if* untrue—that Plummer was committing securities fraud (and siphoning off funds that Debtor needed to pay trade creditors):

> From: Mitch Little [mailto:mitch.little@solidcounsel.com]
> Sent: Friday, July 02, 2010 6:38 PM
> To: Charlie Gale
> Cc: Ben Krage; Ralph Janvey
> Subject: RE: Chestnut/Sage **TRE 408 Settlement Discussion**
>
> Gentlemen:
>
> I've just reviewed R.L. Adkins AFE's and statements and payment history with Plummer responsive to my subpoena.
>
> Your guy has been very naughty. These Hopper wells were generating revenue at the same time Plummer was sending my client and the rest of the investors bills for cost overruns. The reason Plummer wasn't getting the revenue from R.L. Adkins was that he was being netted because he hadn't paid his share of the original lease acquisition/drilling/completion expenses.
>
> As of the last statement from R.L. Adkins dated 4/30/10, Mark owes R.L. Adkins $354,301.06. This was on a $3,926,736 raise before completion assessments. I know he didn't blow his turnkey, because he never even paid the turnkey amount to R.L. Adkins.
>
> The next step I intend to take is to subpoena Sovereign Bank to see where all the money went, since it didn't go into the program. Both the proposed activities and the use of proceeds section of the PPM are 100% false. I've seen the AFE's and what Mark paid, so I know there was a whole lot more promote than the "15% management and acquisition fee" described on Page 20.
>
> I'd propose either a settlement conference or that my client simply be rescinded. Otherwise, hostilities will escalate.

> From: Mitch Little [mailto:mitch.little@solidcounsel.com]
> Sent: Thursday, July 08, 2010 5:46 PM
> To: Charlie Gale
> Cc: Ben Krage; Ralph Janvey; Chris Richie
> Subject: RE: Chestnut/Sage
>
> Charlie/Ben:
>
> I'm proposing a January 30, 2011 trial date to get this one moved along. We've spoken with the coordinator, and this is a civil jury trial date.
>
> Charlie, I got your voicemail about the billing dispute with R.L. Adkins. I'm completely aware of this dispute, since I have all of Mr. Plummer's correspondence with Mr. Adkins.
>
> Attached is our accounting of the relationship between Chestnut and R.L. Adkins. My client was sold this program on the basis that the two Hopper wells had been completed and were producing prior to my client's investment and that my client would begin receiving his investment back as soon as he invested.
>
> In reality, Chestnut had NEVER received any revenue from these two wells prior to my client's investment. Even without the netting, these wells had never generated revenue in excess of expenses for the three months prior to my client's investment. These wells had absolutely no chance of ever returning my client's money to him; Chestnut knew this prior to taking my client's money and failed to disclose it.
>
> In September 2008, Chestnut sent no supporting documentation with his monthly statement. This is because the wells generated revenue in excess of expenses; however, because Chestnut was being netted, he sent my client a BILL instead of a revenue check. Flatly, Plummer stole my client's revenue for that month.
>
> He sent a short letter on October 24, 2008, stating that he was having trouble "getting production/expense information from R.L. Adkins." I have the documents in my possession that prove that this statement was false at the time that he wrote it.

5.      Red flags like this one flooded into Krage & Janvey year after year, as more creditors and investors sued Plummer, Debtor, and entities in the Ventures, and as regulatory agencies continued to bring enforcement action after enforcement action. Krage & Janvey, who acted as a de facto general counsel for Plummer, was aware of it all and represented Plummer, Debtor, and the Ventures in most of it (and almost always at Debtor's expense). By November 2013, Krage &

Janvey would have (or should have) known that Plummer was not running a legitimate oil and gas business and, therefore, was using Debtor to incur costs Plummer knew would not be repaid.

6.     As a result, when Krage & Janvey was "representing" Debtor in litigation filed by trade creditors from 2013 to 2017, Krage & Janvey knew or should have known: (1) Debtor was insolvent, would never be solvent, and would unquestionably end up in this Bankruptcy; (2) the positions Krage & Janvey was asserting on Debtor's behalf were baseless and would, more likely than not, only increase costs and the inevitable judgment or settlement against Debtor; and (3) all funds Debtor paid to Krage & Janvey for this "representation" were funds that would not be available for Debtor's creditors whenever the inevitable Bankruptcy occurred.

7.     Despite this, Krage & Janvey continued to aid Plummer in all his endeavors (including Salmon 2W, for which Plummer was indicted) at Debtor's expense. In fact, in the four years predating the initiation of this Bankruptcy alone, Krage & Janvey received approximately $1 million *from Debtor* in fraudulent and preferential payments (the "Transfers").[5]

8.     To be clear, Krage & Janvey was not a random, arms-length vendor for Plummer or the Ventures. Krage & Janvey was a critical part of Plummer's inner circle and, through its decade-long representation of Plummer and the Ventures, had more knowledge about Plummer's actions than arguably any person or entity other than Plummer himself. In other words, Krage & Janvey was much too close for far too long to credibly feign ignorance now.

9.     At the very least, Krage & Janvey, *managed by a self-proclaimed expert in securities fraud*, intentionally stuck its head in the sand so that it could continue to cash Debtor's checks for legal representation that, by at least November 2013, it knew and foresaw would only injure Debtor. Consequently, through this action, Trustee seeks to recover the damages that Debtor sustained as

---

[5] *See* the list of Transfers that Trustee has identified to date, attached hereto as **Ex. 2**.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                    **PAGE 5**

a result of Krage & Janvey's negligent "representation" of Debtor and participation in Plummer's breach of duty to Debtor, as well as the fraudulent and preferential Transfers that Krage & Janvey received.

## II. PARTIES

10. Plaintiff is an individual residing in Texas, acting in his capacity as Chapter 7 Trustee in Bankruptcy, who may be served with pleadings and process in this adversary proceeding through his undersigned counsel.

11. Defendant is a Texas law firm, who has answered and appeared in this adversary proceeding and who may be served with pleadings and process through its counsel of record, John P. Lewis, Jr., HAYWARD, PLLC, 10501 N. Central Expressway, Suite 106, Dallas, Texas 75231.

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

13. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

14. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

15. The statutory bases for the relief requested herein are 11 U.S.C. §§ 105, 502, 541, 544, 547, 548, and 550(a).

## IV. STANDING

16. A trustee acts to, among other things:

- recover funds into a debtor's estate;

- pay creditors of a debtor's estate;

- assess and assert claims belonging to a debtor's estate; and

- liquidate other assets of a debtor for the benefit of the debtor's estate, as well as its creditors.

17.     In addition, a trustee is authorized under Title 11 of the United States Code (the "Bankruptcy Code") to pursue recovery from entities and individuals who received preferences and/or transfers to the detriment of the debtor's estate.

18.     Here, Trustee has standing to bring his claims against Krage & Janvey pursuant to the Bankruptcy Code, including 11 U.S.C. § 101 et seq. and §§ 323(b) and 704(a)(1), because, among other reasons, Debtor incurred losses as a result of the claims set forth in this Amended Complaint.

## V.     PROCEDURAL BACKGROUND

19.     Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 29, 2017 (the "Petition Date"), thereby commencing the Bankruptcy Case. [Bankr. DE #1].[6]

20.     On January 19, 2018, Jason R. Searcy was appointed as Chapter 11 Trustee. [Bankr. DE #90].

21.     On July 27, 2018, the Bankruptcy was converted to a Chapter 7. [Bankr. DE #209].

22.     On January 23, 2019, Robert Yaquinto, Jr. was appointed as successor Trustee following the unexpected death of Jason R. Searcy.

23.     On November 27, 2019, Trustee commenced this adversary proceeding against Krage & Janvey (the "Adversary Proceeding"). [Adv. DE #1].

24.     On December 2, 2019, the Court entered a standard scheduling order for the Adversary Proceeding that set trial for June 8, 2020. [Adv. DE #3].

25.     On March 27, 2020 and March 29, 2020, the parties amended the scheduling order by agreement and moved the trial to December 14, 2020. [Adv. DE #8-9]. Between March 29, 2020 and August 31, 2022, the parties paused the Adversary Proceeding through a series of amended

---

[6] As used herein, the pre-fix "Bankr. DE" refers to docket entries in the Bankruptcy Case. The pre-fix "Adv. DE" refers to docket entries in this Adversary Proceeding.

scheduling orders and abatements, initially due to COVID-19 concerns and then, later, because the

parties were exploring potential resolution. Specifically:

- On October 23, 2020, Trustee filed an unopposed motion to amend the scheduling order a second time because the COVID-19 pandemic had halted the progress of the case [Adv. DE #11]. On October 28, 2022, the Court entered the second amended scheduling order, and trial was moved to January 10, 2022. [Adv. DE #12].

- On August 11, 2021, Trustee filed an unopposed second motion to amend the scheduling order based on the pandemic's continued interference with the case, including Trustee's ability to conduct an in-person review of Debtor's hard-copy files at Krage & Janvey's office. [Adv. DE #14]. In addition, the parties wanted time to initiate and conduct settlement discussions. On August 19, 2021, the Court entered the third amended scheduling order, and trial was moved to May 9, 2022. [Adv. DE #15].

- Beginning in February 2022, the parties filed a series of agreed motions to abate the case (and extensions) in order to further explore potential resolution. [Adv. DE #18, 21, 24]. The Court entered each proposed order, which ultimately abated the case until *August 31, 2022*. [Adv. DE #20, 23, 25].

26.    Just before the end of the abatement, the parties' settlement discussions came to an

impasse. As a result, Trustee prepared and filed this Amended Complaint.

27.    At the time of filing his Original Complaint, Trustee's investigation to uncover potential

claims against Krage & Janvey related to Krage & Janvey's representation of Debtor was in its

infancy. This Amended Complaint is a result of the development of that investigation, including

documents that were obtained by Trustee in the course of informal discovery, such as Debtor's

hard copy files from Krage & Janvey.

### VI.    FACTUAL BACKGROUND

**A.    The Ventures**

28.    As a preliminary matter, Debtor, now known as Texas E&P Operating, Inc., was formerly

known as Chestnut Petroleum, Inc. and, later, Chestnut Exploration and Production, Inc. Around

2016, Krage & Janvey helped Plummer change the names of various entities in the Ventures,

including Debtor, from having the prefix "Chestnut" to the prefix "Texas E&P." At the time, there were multiple negative postings about Plummer and "Chestnut" available online, which Plummer knew would hinder his ongoing fundraising efforts. As a result, while many of the documents referenced in this Amended Complaint refer to "Chestnut Exploration and Production, Inc.," those references are all to Debtor.

29.     Plummer sold unregistered private placement interests in the Ventures. Plummer, directly or indirectly, owned and controlled each of the entities in the Ventures and occupied a fiduciary role in all of them, including Debtor. Plummer generally referred to himself as the Chairman and CEO of the "Chestnut Exploration Companies" and was the President of Debtor.

30.     Within the Ventures, there were entities focused on fundraising, such as Texas E&P Partners, Inc.; entities focused on operation, such as Debtor; and venture-specific entities, such as Texas E&P Production Fund I, LP and Salmon 2W Joint Venture, which bought the leasehold interests in the joint ventures.

31.     As the "operator" of the Ventures, Debtor's services would theoretically include: (1) managing the drilling and completing of wells under certain Joint Operating Agreements; (2) managing actual well development (in a role akin to a general contractor); and (3) conducting business operations of Debtor.[7] In addition, Debtor prepaid significant segments of well development costs.[8]

32.     As a result, Debtor entered into contracts with vendors on behalf of the Ventures and incurred a majority of the operational debt upfront. As indicated in one of the model form operating agreements used by Debtor, Debtor was charged with "promptly pay[ing] and discharging expenses incurred in the development and operations of the 'Contract Area'." However, as also

---

[7] Lain Faulkner ("LF") Report at p. 13.
[8] *Id*. at p. 13.

TRUSTEE'S FIRST AMENDED COMPLAINT                                                    PAGE 9

detailed in that agreement, Debtor had the right "*to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations.*"[9]

33.    In other words, the joint ventures themselves were (and should have been) ultimately responsible for paying all drilling and operation costs.[10] Yet, approximately $10 million of the creditor claims against Debtor in this Bankruptcy are specifically for trade debt. In addition, Debtor paid out settlement payment after settlement payment to trade creditors that should have been funded by the joint ventures.

34.    Importantly, Krage & Janvey was regularly involved in the drafting and revision of the governing documents for the Ventures. As such, Krage & Janvey had a clear understanding of Debtor's role in the Ventures, including Debtor's contractual rights and obligations. However, it was often Krage & Janvey itself that helped Plummer strap Debtor with judgments and settlement payments on the road to this Bankruptcy.

**B.    Krage & Janvey's Attorney-Client Relationship**

35.    Debtor relied on Krage & Janvey to provide advice and counsel that would allow Debtor to take actions in its best interests or, conversely, avoid actions not in its best interests.

36.    While Krage & Janvey has been representing Plummer, Debtor, and other entities related to the Ventures for more than a decade, there is no written engagement agreement with Debtor limiting the scope of services and legal advice Krage & Janvey was to provide to Debtor.

---

[9] Emphasis added.

[10] *See* Plummer testimony at 192:20-193:11 (Q. I'm going to refer back to, again, paragraph 1 of the turnkey drilling contract. And towards the last half of the paragraph it states, Owner is responsible to the contractor for one hundred percent of the cost of purchasing and/or drilling and completing all four prospective wells covered by this contract regardless of the drilling or packaging of the fourth well. And all payments and compensation provided hereunder relate only to owner's interest. So what this paragraph is saying is that the investors are required to pay complete drilling and completion funds for four wells regardless of whether or not these wells are drilled. Is that correct? A. Yeah. … yeah, that's what it seems to say.").

37. In addition, it does not appear that Krage & Janvey ever: (1) obtained any conflict waiver(s) from Debtor for its concurrent representation of Plummer and the other entities related to the Ventures; or (2) advised Debtor regarding any potential and existing conflicts of interest, which were rampant.

38. In effect, Krage & Janvey operated like an outside general counsel for Plummer and the Ventures, handling a constant mix of litigation, regulatory matters, and business matters— basically anything and everything Plummer wanted Krage & Janvey to do. This included advising Plummer on new offerings in the Ventures and reviewing and revising offering documents. However, no matter what Krage & Janvey did, it always prioritized Plummer's individual interests in order to help Plummer achieve his "long-term objectives."[11]

> ready. 8-remember, I am always ready to help you in whatever way that I can. If there is something that I am not doing, or not doing enough, just let me know. My only goal as your lawyer is to try and help you achieve your business objectives while trying to protect you from liability on both the investor and regulatory front. You have always been a great client and I consider you a friend and care about you and your goals. Let us be smart and work together to make sure that you plan your business activities to achieve long-term objectives that are important to you and not react or over-react in a counter-productive way that may harm your long-term objectives. Thanks, Ralph

39. Unfortunately for the creditors and investors, Krage & Janvey turned out to be *highly* effective in helping Plummer achieve his "long-term objectives."

**C.   Debtor's Insolvency**

   ***1) Debtor's Financials and Bankruptcy Schedules***

40. Debtor was insolvent during the four years preceding this Bankruptcy.

41. From 2013 through 2015, Debtor's federal tax returns show an annual, negative equity between $6- $8 million.[12]   By 2015, Debtor's liabilities exceeded its assets by approximately *$8.5*

---

[11] *See* the November 13, 2012 e-mail from Ralph Janvey to Plummer.
[12] LF Report at p. 12 and 16-17.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                    **PAGE 11**

*million*, and it had *nearly $5 million in accounts payable* (over $4 million of which was comprised of invoices that were 90 days past due).[13] As shown below:[14]

| Texas E&P Operating, Inc. Unpaid Accounts Payable by Invoice Year 2014 - 2017 | | |
| --- | --- | --- |
| Year | Total Incurred During the Year that Remains Unpaid | Cumulative |
| Pre-2014 | $ 4,836.57 | $ 4,836.57 |
| 2014 | $ 1,398,390.15 | $1,403,226.72 |
| 2015 | $ 3,568,271.27 | $4,971,497.99 |
| 2016 | $ 2,693,248.42 | $7,664,746.41 |
| 2017 | $ 1,752,520.39 | $9,417,266.80 |
| Grand Total | $ 9,417,266.80 | |

42.     In short, by November 2013, Debtor was not able to pay debts as they were coming due, and its financial health only continued to deteriorate from 2014 through 2017.[15]As shown below:[16]

| | 2013 | 2014 | 2015 | 2016 | 2017 |
| --- | --- | --- | --- | --- | --- |
| Total Income | $ 3,504,110.79 | $ 3,179,731.34 | $ 2,168,276.80 | $ 1,402,359.42 | $ 746,865.20 |
| Total Cost of Operations | $ (2,876,049.54) | $ (2,799,921.14) | $ (2,294,046.49) | $ (1,895,288.88) | $ (1,055,446.44) |
| Total Expenses | $ (2,748,898.56) | $ (3,956,842.75) | $ (3,886,905.21) | $ (3,241,798.24) | $ (2,596,074.27) |
| Total Other Income & Expenses | $ 2,717,404.90 | $ 3,950,283.32 | $ 2,072,289.00 | $ 1,942,028.13 | $ 72,474.19 |
| Net Income | $ 596,567.59 | $ 373,250.77 | $ (1,940,385.90) | $ (1,792,699.57) | $ (2,832,181.32) |

---

[13] *Id.* at p. 12 and 16-17.
[14] *Id.* at p. 17.
[15] The Trustee does not have a copy of the 2016 return, and it is not known whether a 2016 tax return was filed.
[16] LF Report at p. 12.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                    **PAGE 12**

| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Total Current Assets | 3,181,463 | 2,034,525 | 490,050 | 163,010 |
| Total Fixed Assets | 242,571 | 286,170 | 77,787 | 79,762 |
| Total Other Assets | 1,193,790 | 1,521,786 | 3,249,705 | 3,532,175 |
| **Total Assets** | $ 4,617,824 | $ 3,842,481 | $ 3,817,542 | $ 3,774,947 |
| **LIABILITIES** | | | | |
| Total Current Liabilities | 3,708,356 | 6,474,552 | 8,347,298 | 10,910,359 |
| Total Long Term Liabilities | 7,257,796 | 5,877,118 | 5,665,218 | 5,921,551 |
| **Total Liabilities** | $10,966,152 | $12,351,670 | $ 14,012,516 | $ 16,831,909 |
| **Total Shareholder's Equity** | $ (6,348,328) | $ (8,509,189) | $(10,194,974) | $(13,056,962) |
| **Total Liabilities & Shareholder's Equity** | $ 4,617,824 | $ 3,842,481 | $ 3,817,542 | $ 3,774,947 |

43.     To the extent the Statement of Financial Affairs (the "SOFA") and Bankruptcy Schedules (the "Schedules"), *which were filed by the now-indicted Plummer* [Bankr. DE #49-50], suggest any viability of Debtor or "real" business activities, the income and assets set forth in those documents are unreliable *at best*. In particular, the SOFA and Schedules are inflated and inconsistent with the Debtor's actual books and records.[17] Additionally, Plummer overstated Debtor's assets on its books and records.[18] Trustee is not aware of any documentation or other information that supports the income and asset valuations contained in the SOFA and Schedules.

---

[17] For example, while Debtor's books and records provide that its income for 2017 was $746,865.20, the SOFA provides that the Debtor's income for 2017 through the Petition Date was $1,664,345.20. *See* SOFA at p. 4.[17] In addition, while Debtor's books and records provide that the total value of the Debtor's assets was $3,774,947.00, the Schedules claim the total value of the Debtor's assets on the Petition Date was $12,586,817.00. As an additional example that any reliance on Debtor's Bankruptcy Schedules is misplaced, the prior Chapter 7 Trustee, Jason R. Searcy, sold, with approval from this Court, Debtor's remaining interests in oil and gas properties (located in Gregg County, Texas, Willacy County, Texas, Anderson County, Texas, Jackson County, Texas Calcasieu Parish, Louisiana and Lea County, New Mexico) for $250,000 (net of expenses). Thus, while Debtor's Bankruptcy Schedules proclaim that these same assets had an economic valued of $12 million, the uncontroverted evidence shows that their actual value was a mere 2% of Debtor's representations.

[18] As demonstrated in a third-party reserve report delivered to Debtor by LaRoche Petroleum Consultants, Ltd., which was attached to the LF Report, and which showed that the value of Debtor's assets was really only $2.8 million.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                         **PAGE 13**

### 2) Lawsuits Against Debtor

44. During the same timeframe, lawsuits against Debtor began to mount. Unsurprisingly, various investors and creditors, including unpaid oilfield vendors and service providers, began filing actions against the increasingly insolvent Debtor. Moreover, many of the lawsuits were reduced to judgments greater than the amounts originally owed, due to *legal fees and related court costs* being added to the amount of the judgment. In addition, while Debtor was not a party to a number of lawsuits, Debtor paid all of Krage & Janvey's legal fees and settlements. For example, in settlement communications on one lawsuit in July 2014, Krage & Janvey indicated that it would be *Debtor* who would be buying out investors in certain *joint ventures*.

45. Notably, in those communications, counsel for the investor also accused Krage & Janvey's client of fraud:

> That last point should not be taken lightly. While I have conveyed to you that I am not big on posturing and don't plan to change that position now, Randy and I have both been rather amazed by some of the written and oral representations made by Chestnut concerning the investments at issue; the knowing recruitment of non-accredited investors for accredited only investments; and the overall skirting of various and sundry securities laws. If you want to see some of the e-mails, we can share them, but I think you and your client already know what we are talking about. I'm

46. In 2015 alone, there were *nearly 30 lawsuits* filed against Debtor seeking amounts in the *millions*.[19] At least 20 more lawsuits against Debtor followed from 2016 to 2017.[20]

### 3) Krage & Janvey's Knowledge of Debtor's Insolvency

47. By November 2013, Krage & Janvey knew or should have known that Debtor was insolvent.

48. Krage & Janvey represented Debtor in the above-described litigation by trade creditors, which alleged Debtor was not paying and could not pay its bills. Indeed, documents from Krage

---

[19] LF Report at p. 19-20.
[20] *See* a list of lawsuits from Debtor's books and records attached hereto as **Ex. 3**.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                          **PAGE 14**

& Janvey show that Krage & Janvey painstakingly tracked all of the litigation against Debtor and the millions Debtor owed to creditors – noting, among other things, the amounts at issue and the amount of any judgments entered:

[A detailed spreadsheet/table tracking litigation against the Debtor is reproduced here. The table contains columns including Status Code, Sheet Date, Ref Date, Company, Named Party, AMT Claimed, Judgment, Set. Sum, Lump Pmt, Monthly, Interest, Type, Judgment Date, Judgment, Lien_1, File Date_1, Lien_2, File Date_2, REL_3, Prop Location, Field, Project, Trial, Cause No., Jurisdiction, and Court. The rows list numerous vendors and service companies (e.g., AAA Well Services, Acid & Cementing, ACME Truck Line Inc, Altus Global Trade Solutions, Anchor Drilling Fluids, Archer Wireline, Baker Hughes Oilfield Operations, etc.) with claims against Chestnut Exploration & Production, Inc. and related entities. Column totals at the bottom show: $3,680,092.28; $665,040.32; $220,140.49; and $4,265,772.20.]

49.    In the summer of 2014, Krage & Janvey told opposing counsel in settlement discussions that Debtor would need to pay a settlement out over a two-year period. The investor's counsel astutely pointed out the discrepancy between Debtor's apparent need for a long-term payment plan and Plummer's public statements about the financial health of the Ventures:

> For starters, if Chestnut is not in a position to pay our clients from current assets at the time of settlement (which would be rather interesting given the company's public statements about how well it is doing [i.e. http://www.chestnutpetro.com/newsroom/press-releases/chestnut-exploration-production-inc-announces-promising-initial-production]), then it should certainly be in a position to get a loan based on current assets and those it would be acquiring from our clients. A two year pay-out is not acceptable. One of the main objects of this exercise is for these individuals to separate from Chestnut; they have no desire to be tied to the company for another two years.

50.    Ralph Janvey ("Janvey"), the managing partner of Krage & Janvey, was listed as a registered agent for Debtor during 2015.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                    **PAGE 15**

51.    Moreover, by 2014 Debtor was even struggling to pay Krage & Janvey's bills—a problem that persisted until Debtor filed Bankruptcy. Krage & Janvey had to constantly track down payments from Debtor:

**From:** Ralph Janvey
**Sent:** Wednesday, May 06, 2015 8:59 AM
**To:** Mark Plummer
**Subject:** Outstanding invoices
**Importance:** High

Mark- let me start by stating that I hope you are feeling okay . I know that you and your family are going through very serious health issues and I am very sensitive to that. I also know that sales have been hindered due to both John Buttress and FINRA. We are still doing a lot of work for you in front of FINRA and as Daniel and Ray will tell you that will increase next week when Mark Hendrix gets back in the office. FINRA is not going away and we are prepared to challenge and contest their actions in the appropriate time and forum. As of May 4, which is our latest invoice to you which includes time through April 30th, we have outstanding invoices for $53,720,47 and a current invoice for March, which includes time that Mark and Paul spent, for $31,314 for a total outstanding balance of $85,034,47. Mark, as you know, we always try and work with you and are sensitive to your cash needs. But we also have cash needs and this amount is just too large. Please make a payment this week and let me know a schedule of how we can get current on your outstanding invoices. The work for May and June by Mark Hendrix I believe will be quite a bit and we need to get these invoices paid. I am sending this to you by email because I am in depositions today and tomorrow. But you can reach met today be email and I will call you back or leave me a voice message. Thanks, Ralph

**From:** Ralph Janvey
**To:** Mark Plummer
**Subject:** FW: Opportunity Fund
**Date:** Wednesday, June 24, 2015 1:21:33 PM
**Attachments:** image001.png
2015.06.23 506c.xlsx
**Importance:** High

Mark- I hope that you are feeling better and recovering from your surgery. Daniel has been keeping me up to date on your recovery. I am not sure if you are back in the office. I did not want to bother you with a phone call. Please see the email below. As you will remember, we were promised weeks ago a $25,000 payment once you broker escrow on your new offering and that you would make payments on regular basis to catch up on the outstanding invoices some of which are 5 months old and total $105,000 through the end of last month. Daniel told last week that you have already broken escrow. I have always tried to work with you and help with cash flow issues, but we need to get paid on the work that we have performed . It is not fair to us to start on a new project and not receive a payment along with a plan on how to get current . Please let me know if you have any questions or want to discuss this email.
Thanks,
Ralph

**From:** Ralph Janvey <rjanvey@kjllp.com>
**Sent:** Monday, November 09, 2015 10:44 AM CST
**To:** Mark Plummer <mark@chestnutep.com>
**CC:** Mark Hendrix <mhendrix@kjllp.com>
**Subject:** payment not received

Mark- Mark H told me after he visited with you in your office that you were going to send us a check for $50,000 either by the 30 th of October( which is the end of the week that Mark met with you) or by the end of the week of November 6th. As of today, we have not received any payment. Also, Mark H told me that you would send us $50,000 per month until the total outstanding invoices were paid. Mark, please let me know the status of our payment and why we have not received it by the dates that you promised Mark H. We have not received any payment from you since the beginning of September. Thanks, Ralph

| | |
|---|---|
| **From:** | Ralph Janvey |
| **To:** | Braden Tingle |
| **Cc:** | Mark Plummer; Mark Hendrix |
| **Subject:** | FW: Chestnut Invoice |
| **Date:** | Tuesday, February 2, 2016 1:00:36 PM |
| **Attachments:** | Chestnut Invoice.pdf |
| **Importance:** | High |

Braden- attached is our invoice. Mark the last time we received any payment was January 4th for $10,000. The amount is now $285,000. Mark and Valerie did @ $54,000 worth of legal work for you in January defending you and trying to help Daniel and Ray with revised offerings based on changes and work which you requested. Please let me know when we will get paid.

Thanks,
Ralph

| | |
|---|---|
| **From:** | Ralph Janvey |
| **Sent:** | Friday, May 19, 2017 2:49 PM |
| **To:** | Mark Hendrix |
| **Cc:** | Terri Baxter |
| **Subject:** | Plummer |
| | |
| **Importance:** | High |

Mark- when you speak with Plummer next week to get our check for $30,000, please try and remind him that he has always told me (and I think you) that when he refinanced his loan with the bank we would get paid all or a large amount of our outstanding legal fees. You mentioned to me yesterday that you thought he would pay us going forward out of distributions from the well production. We never discussed that with him and that is not what he has promised us over the past few years. Please visit with him about this- I know it only becomes an issue when he gets his refinancing so you may want to wait until the bank is paid off but getting paid over the next three-four years was never our arrangement once he took out the bank.. His paying us out of production will only serve to continue to delay us getting paid. We are being treated like an ordinary supply vendor and I have more respect for you and our work than that. I do not think he appreciates that your work , as well as Paul's, is keeping the wolves at bay- especially now that the SEC has raised their head again.  By the way you received a 69 page fax this afternoon for a motion for summary judgment on an account. I gave it to Terri.  Thanks, Ralph

52.     At one point, in 2016, Krage & Janvey even refused to assist with an arbitration hearing until Debtor paid all of Krage & Janvey's invoices. Of note, Plummer was requesting Krage & Janvey's help because Locke Lord was withdrawing due to Plummer's failure to pay legal fees.

**From:** Mark Plummer [mailto:map@texasepgroup.com]
**Sent:** Wednesday, March 16, 2016 11:52 AM
**To:** Ralph Janvey <rjanvey@kjllp.com>
**Cc:** Mark Hendrix <mhendrix@kjllp.com>
**Subject:** FW: C.P. Foster et al. v. Chestnut Exploration, et al.; Case No. 01-15-0004-8160 - Notice of Withdrawal

Hey Ralph, Locke Lord is dropping me ahead of an arbitration hearing because I'm behind with them.  What do you suggest I do?  Mark

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                        **PAGE 17**

| From: | Ralph Janvey |
| To: | Mark Plummer |
| Cc: | Mark Hendrix |
| Subject: | RE: C.P. Foster et al. v. Chestnut Exploration, et al.; Case No. 01-15-0004-8160 - Notice of Withdrawal |
| Date: | Wednesday, March 16, 2016 12:32:54 PM |

Mark- if the hearing is in the near future the only thing I can suggest is for Brian to try and represent you. If the hearing is not in the near future and there is time to prepare and get the case ready we could assist you but we would have to have you get current on our outstanding invoices. We cannot take on no more new matters until you are current with us. I have spoken with Mark H and he is in agreement with me. I think your best option may be Brian.

53.     In 2016, Krage & Janvey was also aware of Debtor failing to make settlement payments in *numerous* previously-settled lawsuits.

From: Cherie Schade <cschade@dorelawgroup.net>
Date: April 5, 2016 at 10:01:25 AM CDT
To: "mhendrix@kjllp.com" <mhendrix@kjllp.com>
Cc: Alex Weatherford <aweatherford@dorelawgroup.net>
Subject: Newpark & Thru Tubing Solutions, Inc. & Cudd Pressure Control, Inc. (Re: Chestnut Exploration)

Mr. Hendrix,

Please be advised that we have not received the April payments for our clients (1) Newpark Drilling Fluids LLC and (2) Thru Tubing Solutions, Inc. & Cudd Pressure Control, Inc.

Would you please check the status of these payments and let us know as soon as possible.

From: Terri Baxter <tbaxter@kjllp.com>
Date: April 4, 2016 at 1:08:06 PM CDT
To: Mark Hendrix <mhendrix@kjllp.com>
Subject: FW: Wellbore v. Chestnut

Chestnut has failed to make the Wellbore March payment

From: Scott, Jim [mailto:jscott@gardere.com]
Sent: Monday, April 04, 2016 9:12 AM
To: Terri Baxter
Subject: RE: Wellbore v. Chestnut

We've not seen the March 2016 payment yet. Please check with your client as to when we can expect it.

Thanks,
Jim

From: Martin Bennett <mbennett@ksbpc.com>
Date: March 24, 2016 at 11:07:50 AM CDT
To: 'Mark Hendrix' <mhendrix@kjllp.com>
Subject: MKS Services, LLC v. Chestnut Exploration and Production, Inc. et al

The Rule 11 Agreement we made in this case has been breached, and we will proceed with this litigation. Specifically, the payment of $7,500 due on March 15, 2016 has not been paid.

Please note:
   (1) Discovery requests were presented to Chestnut East Texas 1-H JV on date of December 16, 2015. No responses have been received. This also included a Request for Admissions that are now deemed admitted. I request for you to provide a response to the other discovery request by the date of March 30, 2016, or I will file a motion to compel.
   (2) I have previously filed a Motion for Discovery Sanctions on date of December 3, 2015 against Chestnut Exploration and Production Inc. and Chestnut Petroleum Inc.. I will set a hearing on this motion as soon as the court will allow.

54.     During this time frame, it would have been apparent to Krage & Janvey (and anyone with the knowledge of the Ventures that Krage & Janvey had) that: (1) bankruptcy was a foregone conclusion for Debtor; and (2) the creditor claims against Debtor would only increase the longer Plummer continued with his "fundraising."

**D.      Krage & Janvey's Knowledge (or Constructive Knowledge) of Plummer's Fraud**

55.     By 2013, Krage & Janvey knew or should have known that Plummer was committing securities fraud. Regardless, Krage & Janvey was aware of an overwhelming number of red flags, which would have been even more glaring in light of Janvey's personal knowledge and involvement.

56.     Janvey has been practicing law in Texas for more than 40 years. His practice is specifically concentrated in the areas of federal and state securities compliance and enforcement matters; public and private financing transactions; corporate governance and fiduciary duties; and organizational structuring issues. He has served as an SEC and court-appointed equity receiver, including, most notably, *as the current receiver of the Stanford Financial Receivership*, and as an expert witness for the United States Department of Labor in FINRA arbitrations.

57.     Janvey is experienced in both securities laws, as well as the laws and regulations governing the Texas Oil and Gas industry and is one of the attorneys most able to identify illegal, improper and/or fraudulent conduct in that space.

58.     In addition to the barrage of creditor lawsuits, Krage & Janvey: (1) defended Plummer, Debtor, and other entities in the Ventures against numerous lawsuits by investors alleging fraud or misuse of investor funds; and (2) represented Plummer, Debtor, and other entities in the Ventures, against a steady and highly-concerning stream of enforcement actions by FINRA and other regulatory bodies. These lawsuits and regulatory and enforcement actions began in the early 2000s and only increased in frequency as the years progressed.

TRUSTEE'S FIRST AMENDED COMPLAINT                                                    PAGE 19

59.     Trustee is aware of documents as early as 2006 relating to Texas State Securities Board
("TSSB") subpoenas.

| From: | Ralph Janvey |
|---|---|
| To: | Mark Plummer |
| Subject: | Texas State Securities Board |
| Date: | Friday, February 24, 2006 10:39:11 AM |
| Attachments: | Ralph S. Janvey.vcf |

Mark- I received in the mail the subpoena and they have rather extensive document production list.
Please call me so that I can fax it over to you when you are in the office. We need to discuss it. Thanks,
Ralph

60.     Moreover, as indicated above, by no later than 2010, Krage & Janvey knew or should have
known that Plummer was committing securities fraud, including because Krage & Janvey was in
receipt of specific allegations against Plummer that Krage & Janvey could have easily contradicted
(had they not been true). Also in 2010, Krage & Janvey, among other services, assisted Plummer
in responding to an SEC Audit Letter and requests for information.

| From: | R Janvey |
|---|---|
| To: | Mark Plummer |
| Subject: | FW: SEC Audit Letter |
| Date: | Wednesday, March 3, 2010 7:46:52 AM |
| Attachments: | image001.jpg |

Mark- In assisting you, you need to decide if you want me merely review the SEC letter and your
response or get more involved. In reading the SEC letter, I do not believe that they will stop with
your response. You may want to consult with Joel Held and see if he wants to get involved because I
do believe that the staff will continue on their investigation(or examination). I am perfectly happy in
helping you and jumping in and dealing with the staff going forward if that is your wish.  I have some
investigations currently pending before them.   Please let me know your preference. Thanks, Ralph

61.     In 2011, Krage & Janvey assisted Plummer in responding to a FINRA examination, SEC
matters, and an investigation by TSSB.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                             **PAGE 20**

KRAGE & JANVEY, L.L.P.
ATTORNEYS AND COUNSELORS AT LAW
2100 ROSS AVENUE
SUITE 2600
DALLAS, TEXAS 75201
TELEPHONE 214/969-7500
FACSIMILE 214/220-0230

March 9, 2011

FINRA, District 6
12801 N. Central Expressway
Suite 1050
Dallas, TX 75243

Attention:    Mr. Jon Britt and Ms. Annie Auld

Re:    Chestnut Energy Partners, Inc.
       Examination No. 20110256115

Dear Mr. Britt and Ms. Auld:

Our firm represents Chestnut Energy Partners, Inc. ("Chestnut Energy"), Mr.
Mark Plummer, and his affiliated entities. It is my understanding that you have requested
of Chestnut Energy in connection with the above-referenced examination to provide you
bank records for Chestnut Petroleum, Inc. ("Chestnut Petroleum") for the time period
from January 2009 to January 2011. As I am sure you are aware, Chestnut Petroleum is
not an issuer of any securities subject to your examination, and it has not received any
funds directly from any investors who have been sold investments by Chestnut Energy.
Rather, Chestnut Petroleum is a driller-operator who contracts with Chestnut Exploration,
Incorporated to drill, test, and complete wells on a turnkey basis.

| | |
|---|---|
| **From:** | Ralph Janvey |
| **To:** | Mark Plummer; Carolyn Stewart |
| **Subject:** | FW: In the Matter of Chestnut Energy Partners, Inc (FW-3490) |
| **Date:** | Wednesday, January 26, 2011 12:22:41 PM |
| **Attachments:** | Chestnut Subpoenas Jan 2011 (FW_3490).pdf |

Mark and Carolyn- I just received this via email this morning. I am reviewing the subpoena. Please
call me to discuss at your convenience. Thanks ,Ralph

Ralph S. Janvey
Krage & Janvey, L.L.P.
2100 Ross Avenue, Suite 2600
Dallas, Texas 75201
Direct Line: (214) 397-1912
Fax: 214-220-0230
rjanvey@kjllp.com

This message ,including any attachments, is for the sole use by the intended recipient and may
contain confidential and privileged information. Any unauthorized review, use, disclosure or
distribution is prohibited. If you are not the intended recipient, please notify the sender by reply e-
mail and delete   this message without disclosing it.

**From:** Jackman, Michael [mailto:JackmanM@SEC.GOV]
**Sent:** Wednesday, January 26, 2011 11:13 AM
**To:** Ralph Janvey
**Cc:** Scott, Jonathan; Wren, Lisa N.
**Subject:** In the Matter of Chestnut Energy Partners, Inc (FW-3490)

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                                     **PAGE 21**

From: Ralph Janvey
To: Mark Plummer; Carolyn Stewart; Ken Shade
Subject: FW: Chestnut Energy Partners - Proposed Order (for settlement purposes only)
Date: Monday, October 17, 2011 8:08:51 AM
Attachments: CEP Proposed Order 10142011 - For Settlement Purposes Only.PDF

Mark- I know this is not the best way to welcome you back from your trip but as your attorney I have no choice but to forward it to you to discuss. It has ramifications on a number of issues and I would like to visit with you this afternoon to discuss them. I have spoken to Carolyn about this and she is available to meet this afternoon. I am available anytime after 4 and can come to your office. I am also in the office all morning. Thanks, Ralph

62.     Two years later, on January 10, 2012, the TSSB issued an order against Texas E & P Partners, Inc.,[21] Order No. IC12-CAF-06, wherein it *found* that the entity used false and misleading marketing materials in seeking investments from investors.

63.     In a 2013 enforcement action brought by FINRA, Krage & Janvey personally witnessed Plummer's false representation to an investor in a recording where Plummer misled the investor into believing Plummer had 50 percent of his own money in "all of these projects."[22] While represented by Krage & Janvey, Plummer admitted to the FINRA examiners: "And so, you know, do I have 50 percent in that project? *No*."[23]

64.     Nevertheless, Krage & Janvey continued to assist Plummer in raising funds for various non-debtor ventures and continued to charge *Debtor* for its services (depriving Debtor's real creditors of funds needed to satisfy debt).

65.     By early 2015, FINRA—*an outside party*—was able to recognize Debtor's insolvency and Plummer's use of Debtor as a debt scapegoat. On April 30, 2015, FINRA sent a letter to Texas E&P Partners, Inc.[24] (which it then forwarded to Janvey) inquiring into the disclosures made by Texas E&P Partners, Inc. in connection with Plummer's Salmon 2W Joint Venture, which Krage

---

[21] At that time, Chestnut Exploration Partners, Inc.
[22] *See* June 6, 2013 Testimony of Plummer; Enforcement Matter 20110256115 at 278:7-282:2.
[23] *Id*. at 281:21-282:1 (emphasis added).
[24] At the time, Chestnut Exploration Partners, Inc.

& Janvey aided Plummer in establishing.[25] In particular, FINRA sought explanations as to why the following material facts, including primarily information *regarding Debtor*, were omitted from the Salmon 2W Joint Venture's Confidential Information Memorandum:

> 1. The multiple liens/lawsuits that have been filed against Chestnut Exploration and Production (the "Operator"). As an affiliate of the Managing Venturer and the party with which the JV is proposing to enter into an Operating Agreement;
> 2. The lien filed against various Chestnut entities by Prosperity Bank claiming the assets of those Chestnut entities as collateral for an $8 million loan (with an outstanding balance of approximately $6.5 million);
> 3. The existence of a $6.5 million loan balance as the primary liability to the Operator;
> 4. The most current financials of the Operator; and
> 5. Additional detailed information regarding the mechanical failure of the East Texas 1H Joint Venture, including but not limited to:
>    a. The impact on the offering if the insurance claim is denied;
>    b. The impact on the Operator (as that entity is common to the Salmon offering) if the vendor's liens remain unpaid; and
>    c. The reason for the failure.

66.    Notably, Krage & Janvey knew that FINRA had raised questions about Debtor's solvency for years:

> **From:** Mark Plummer [mailto:mark@chestnutpetro.com]
> **Sent:** Tuesday, March 27, 2012 8:43 AM
> **To:** Carolyn Stewart; Ralph Janvey
> **Subject:** RE: Exit Meeting
>
> This is how I would respond to Annie:
>
> Dear Annie,
>
> I enjoyed meeting with the you and the other Finra staff on March 19th for the purpose of covering our CMA process. I would be glad to acknowledge that we meet that day and it is currently evidenced on the Finra visitor log at the Finra receptionist. I would not conclude that the document I was presented just prior to the meeting reflected a true "exit meeting report" because we did not have time to fully review it and not all of the items were thoroughly reviewed with the staff. Also there were gross inaccuracies in the document such as citing that Chestnut Petroleum was insolvent when that is clearly wrong. Anyway, I would love to visit more about the exit process either before or after the OTR testimony whenever you feel it is appropriate.

67.    In 2016, Janvey described why Plummer should not submit a Wells Letter to FINRA, recognizing that the actual level of factual disclosure required would "hurt" Plummer and could result in facts being "used against [him]":

---

[25] *See* April 30, 2015 letter from FINRA.

From: Ralph Janvey
Sent: Wednesday, July 27, 2016 2:58 PM
To: Mark Hendrix; Valerie Thomas
Subject: FW: FINRA Matter - Texas E & P, Mark Plummer, Dan Ramirez, Bill Griffith and Chad Potter - Wells Letter
Attachments: Texas E and P and Mark Plummer Wells.pdf

Importance: High

To prepare a wells submission on issues like this would be very fact intensive and very expensive- @ $25-$50K. Facts that are included could be used against Mark P and the allegations are fraud based not just section 5 based. They also include violations of net capital, supervision etc. A wells submission is totally voluntary. The times that mark P submitted them they did not have the current litigation pending and the allegations were much less aggressive- also the time that he submitted a wells was probably over at least 7 years ago and the environment has changed. I see no benefit to the client in submitting a wells and if it is not done perfectly and carefully- which means intrusive investigation into the allegations they could hurt more than help Mark P.
I get the impression that Mark P thinks a wells submission will make this go away and I strongly disagree. Also, Mark P has never discussed with me doing a wells and I would urge him not to submit one on these allegations. Also, we would probably have a conflict in trying to argue on behalf of Daniel and Bill which Karen references in her re matter.
Thanks,
Ralph

68.     Additionally in 2016, Krage & Janvey assisted Plummer on multiple FINRA matters, including:

- A FINRA inquiry into East TX 1-H due to investor complaint;
- Disciplinary Proceeding No. 2014040501801;
- Enforcement v. Chestnut Exploration;
- Disciplinary Proceeding No. 20150467304;
- 2016 Cycle Exam; and
- FINRA Wells Notices.

69.     Later that same year, on December 13, 2016, FINRA permanently barred Plummer from the securities industry, expelled Texas E&P Partners, Inc., and ordered Plummer to pay restitution and pre-judgment interests to customers whose money FINRA found Plummer had intentionally misused.[26] In doing so, FINRA found that Plummer had misused investor funds and altered a document (about which he also gave false and misleading testimony).[27]

70.     On June 26, 2019, a SEC Complaint indicated that, *between February 2015 and April 2017 (i.e., at the same time Debtor was being regularly sued for unpaid debts)*, Plummer breached his fiduciary duty to Debtor by misappropriating approximately $400,000 investor funds for

---

[26] December 13, 2016 FINRA Decision at p. 31-32.
[27] *Id*. at p. 6, 7-8, 12-18.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                    **PAGE 24**

undisclosed personal and unauthorized business expenses including for entertainment, travel, retail expenses and his income taxes. Among other things, the SEC found the following improper transfers during the period in question:

- country club: $16,682.15;
- restaurants: $17,887.13;
- retail stores: $45,651.23;
- college tuition: $9,028.50;
- racquet club: $13,206.20;
- income taxes: $144,42.58;
- personal transportation: $14,706.96;
- services/memberships: $2,667.99;
- personal travel: $111,523.44; and
- other miscellaneous personal expenses: $23,194.88.

71.     From August 2017 to July 2018, arbitrators awarded more than $2.16 million against Plummer and companies in the Ventures, including imposing damages for fraud, deceit, and misrepresentations.[28]

72.     Nevertheless, at no point in time did Krage & Janvey undertake any remedial actions to protect Debtor's interest. Instead, Krage & Janvey continued to charge Debtor for its services to Plummer and the Ventures.

73.     As a result, Krage & Janvey knew or should have known that Plummer was exploiting Debtor in a scheme to enrich himself at the expense of investors, Debtor, and (ultimately) the creditors in this Bankruptcy.

---

[28] https://brokercheck.finra.org/.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                                  **PAGE 25**

**E.      Krage & Janvey's Liability**

### *1)   The Transfers and Krage & Janvey's Negligent Representation of Debtor*

74.      While Krage and Janvey represented multiple entities in the Ventures and Plummer,

individually, it was Debtor who Krage & Janvey invoiced for its services. For example, below is

an invoice Krage & Janvey sent to *Debtor* for services provided to *Chestnut Opportunity Fund*:



75.      Trustee has become aware that Krage & Janvey received a total of at least $989,894.92 of

Debtor's funds from November 29, 2013 through November 28, 2017 (*i.e.*, the Transfers).[29] As

detailed above, during this time:

- Debtor was insolvent and unable to pay its creditors;

- as a result of its representation, Krage & Janvey knew or should have known that: (1) Debtor was insolvent and unable to pay its creditors; and (2) every dollar Debtor paid to Krage & Janvey was a dollar that would not exist to pay its creditors;

- as a result of its representation, Krage & Janvey knew that Debtor was being sued by trade creditors for debt owed at the time Krage & Janvey was billing Debtor for its services;

- Krage & Janvey knew that Plummer was continuing to use Debtor to incur debt on behalf of the Ventures;

---

[29] *See* Ex. 2.

- Krage & Janvey knew or should have known that Plummer was using Debtor as part of Plummer's scheme to defraud investors and obtain a personal benefit for himself.

76.   Moreover, Krage & Janvey failed to provide value, let alone reasonably equivalent value, to Debtor in exchange for the Transfers. *First*, a substantial portion of the Transfers were for legal services provided to Plummer or entities in the Ventures *other than Debtor* (*e.g.*, investor litigation and regulatory and enforcement actions), which ultimately: (1) facilitated the continuation of Plummer's fraud; and (2) bankrupted Debtor.

77.   *Second*, Krage & Janvey charged Debtor for services in defense of trade creditor litigation but failed to adequately represent Debtor's interest.  Specifically, the "services" that Krage & Janvey provided directly to Debtor in connection with trade creditor litigation were exclusively aimed at keeping trade creditors from going after the joint venture entities themselves (*i.e.*, maintaining Debtor's status as Plummer's debt scapegoat) and delaying this Bankruptcy as long as possible while Plummer continued his fraudulent fundraising.

78.   By way of example, despite the fact that Janvey himself served as Debtor's registered agent, Krage & Janvey would allow default judgments against Debtor, which they would then seek to overturn by drafting multiple form affidavits with identical false testimony that the lawsuits had been misplaced in the "rush of business:"





79.   While misplacing one petition may be possible, misplacing three separate petitions is not.

80.   In addition, Krage & Janvey pursued baseless positions, as shown in the above affidavits, alleging that money had not been paid to the trade creditor because that trade creditor had caused a mechanical failure in the well at issue. Krage & Janvey had no reason to believe this allegation but charged Debtor to assert it anyway. Similarly, during the lawsuit by MKS Services ("MKS") (a vendor) against Debtor, Krage & Janvey told Plummer that he needed to just "pick one" Request for Admission to admit in discovery.

> Mark –
>
> Mark H. believes that one of the Request for Admissions needs to be "admit" – please let us know which request that should be.

81.   As a result, Krage & Janvey billed Debtor for services that, in addition to blatantly violating their ethical duties, unnecessarily drove up litigation costs that Debtor would ultimately have to pay for on the back-end when the case inevitably settled (or the trade creditor obtained a judgment).

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                                **PAGE 28**

82.     *Finally*, Krage & Janvey charged Debtor for services that allowed Plummer to protect both his ongoing fraud and his ability to set Debtor up as the debt scapegoat in this Bankruptcy. As stated above, Krage & Janvey knew that it was the joint ventures who were ultimately responsible for operational costs and understood all of Debtor's rights to reimbursement. Nonetheless, Krage & Janvey: (1) never asserted Debtor's rights; (2) allowed Debtor to enter settlements and become contractually responsible for those operational costs (presumably because Plummer could not explain why the investors' funds were not available to pay these costs); and (3) made representations to the Court and to opposing counsel that it was Debtor and Debtor alone who should carry the burden of the judgment or settlement.

83.     For example, on June 19, 2015, after Krage & Janvey knew or should have known that Debtor was insolvent, Krage & Janvey represented to a Court – over opposing counsel's protests that Debtor was a shell company – that Debtor that should be on the hook for funds owed to a vendor *and that Debtor had the money to pay*:

| | |
|---|---|
| [Opposing Counsel]: | Your Honor, the problem is, the way they tried to structure it, is they want to say Chestnut Exploration is the one that called you and perform this work, because Chestnut Exploration is only an operator, basically a shell of a company. Chestnut Petroleum/Chestnut Lease Fund are the actual parties that own the oil and gas leases. And, again, so when they call us up and say, well – |
| … | |
| THE COURT: | Let's say … that there is a jury verdict … in the case. And the jury says that MKS Services provided services and are due X dollars. … Who is legal on the hook for those funds? |
| [Krage & Janvey]: | Chestnut Exploration and Production. |
| THE COURT: | Who can you get a judgment against? |
| [Krage & Janvey]: | Chestnut Exploration and Production, they have a – had a turn-key drilling agreement – |

THE COURT:        You are telling me no one else –

[Krage & Janvey]:   Was involved in the –a

THE COURT:         Later on down the road, you are not going to tell me: He sued the wrong party?

[Krage & Janvey]:   No, I'm not going to tell you that.

…

[Krage & Janvey]:   *Yeah, that is the right a place to pay, there is no question about it. And as far as I know, they have the money to pay this. The reason it hasn't been paid is because this was a mechanical failure on this well, and there's an issue as to how much – what percentage of that was caused by MKS. That's why it hasn't been paid, it's not because they don't have any money.*[30]

84.    Later, in the same case, Krage & Janvey abandoned all defenses and agreed to have Debtor execute an agreed judgment to be responsible for the entire settlement to MKS. Going further, Krage & Janvey affirmatively represented to counsel for MKS that Debtor had "way more assets than necessary to cover the [agreed] judgment" they were negotiating in settlement. At the time, MKS's counsel indicated his belief that an agreed judgment against the Debtor was "worthless" and requested the well's owner also be bound by the agreed judgment. Krage & Janvey fought to shield the parties actually responsible for the costs—the joint ventures (and their investors)—from being brought into the litigation.

> From: Mark Hendrix [mailto:mhendrix@kjllp.com]
> Sent: Monday, December 07, 2015 10:38 AM
> To: Martin Bennett <mbennett@ksbpc.com>
> Subject: Re: MKS Services v. Chestnut East Texas 1-H JV
>
> We will give you an agree judgment which will not be executed as long as the payments are made.

---

[30] Emphasis added.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                          **PAGE 30**

> On Dec 7, 2015, at 10:42 AM, Martin Bennett <mbennett@ksbpc.com> wrote:
>
> Agreed judgment against who? All the named defendants, including the JV?

> From: Mark Hendrix [mailto:mhendrix@kjllp.com]
> Sent: Monday, December 07, 2015 10:44 AM
> To: Martin Bennett <mbennett@ksbpc.com>
> Subject: Re: MKS Services v. Chestnut East Texas 1-H JV
>
> Agreed judgment against the operating company that your client had an agreement with.

> On Dec 7, 2015, at 10:52 AM, Martin Bennett <mbennett@ksbpc.com> wrote:
>
> I consider that to be worthless. We will proceed against the actual owners of the well.

> From: Mark Hendrix [mailto:mhendrix@kjllp.com]
> Sent: Monday, December 07, 2015 11:23 AM
> To: Martin Bennett <mbennett@ksbpc.com>
> Subject: Re: MKS Services v. Chestnut East Texas 1-H JV
>
> We can attach a balance sheet to the agreement which shows the operating company has way more assets than necessary to cover the judgment.

85.     This conduct illustrates that Plummer's goal (effectuated by Krage & Janvey's "representation" of Debtor) was simply to prolong (*but not prevent*) Debtor's bankruptcy so that Plummer could strap Debtor with unrepayable debt in his fraud against investors. Nonetheless, Krage & Janvey charged Debtor (and Debtor paid Krage & Janvey) approximately one million dollars for the privilege.

### 2) *Perpetuating Plummer's Breach of Fiduciary Duty*

86.     While representing Debtor in an onslaught of lawsuits for unpaid vendors, Krage & Janvey was proffering its help to Plummer to create new offerings, which Krage & Janvey knew or should have known would result in Debtor incurring more and more unrepayable debt.

87.     Nonetheless, at Debtor's expense, Krage & Janvey continued to provide Plummer with legal services that ultimately contributed to the proliferation and success of Plummer's underlying fraud—all to the detriment (and cost) of Debtor.[31]

88.     *First*, as described above, Krage & Janvey, in violation of its duties to Debtor: (1) failed to adequately defend Debtor from trade creditor lawsuits and, in fact worked to ensure that Debtor was the entity that was ultimately saddled with trade creditor debt, judgments, and settlements; and (2) invoiced Debtor for services for Plummer and other entities in the Ventures that either were completely unrelated to Debtor or ultimately harmed Debtor.

89.     *Second*, by Plummer's design, Krage & Janvey's representation of Plummer and the Ventures, cloaked Plummer's fraudulent activities in legitimacy. For example, in 2014, Plummer told F&M Bank that "Ralph Janvey is our main securities lawyer, and of particular note he is also the receiver for the government in the Allen Stanford (Stanford Financial) Caribbean certificate of deposits ponzi scheme." Two years later, Plummer used a similar line in another e-mail, where he boasted that his attorney was the receiver for the government in "the Stanford Ponzi case" and "does not represent crooks."

90.     *Third*, in late 2015, early 2016, Krage & Janvey, at Plummer's request, helped Plummer change the names of the entities in the Ventures, including Debtor, to avoid bad press regarding Plummer's past actions.

---

[31] *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N, 2014 WL 12572881, at *3 (N.D. Tex. Dec. 17, 2014) ("Accepted as true, these allegations support a reasonable inference that Hunton and Suarez were aware to a substantial degree of Stanford's misconduct, yet nevertheless continued to provide legal services that ultimately contributed to the proliferation and success of the underlying scheme. These are sufficient allegations to support claims based on attorney malpractice.").

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                              **PAGE 32**

From: Mark Plummer [mailto:Mark@chestnutep.com]
Sent: Wednesday, December 23, 2015 11:04 AM
To: Ralph Janvey <rjanvey@kjllp.com>
Cc: Terri Baxter <tbaxter@kjllp.com>; bdr@benjamindouglasray.com
Subject: FW: NAME / LOGO IDEAS

Hey Ralph,

We had our new PR guy Ben Douglas review how the TSSB website "10 Investor threats" press release to see how long it would take to fade off page 1 of a google search with time. Ben recommends we change our name as the TSSB programming language appeared to was deliberately written for maximum damage to "Chestnut and Mark Allan Plummer". So there is no need to continue to fight an uphill battle.

So we need to make a change in our name now! See my email below. The new names we want will be:

*Texas Oil and Gas Operating Inc.*, or *Texas E&P Operating Inc.*, or *Texas O&G Operating Inc.*,
*Texas Oil & Gas Exploration Inc.* or *Texas Exploration Inc.*, or *Texas O&G Exploration Inc.*,
*Texas Oil & Gas Partners, Inc.* (needs Finra approval and there is nothing similar on the Finra.org broker check website)

I'll get Ben to check on a good web address and I need you guys to check on the new names we need with the Texas Secretary of State. I couldn't remember which lawyer or paralegal at your firm does this.

91.     *Fourth*, throughout this entire time period, again at Debtor's expense, Krage & Janvey was assisting Plummer in new investment offerings for unsuspecting investors. For example, in February 2013, Ralph Janvey told Plummer that he would be using a "quiet period with FINRA" to draft fundraising documents:

From:       Ralph Janvey
Sent:       Wednesday, February 13, 2013 1:26 PM
To:         Mark Plummer; Ken Shade; Carolyn Stewart; Laurie Tjosvold
Subject:    schedule

Mark- in order to move projects along, and while we are in a quiet period with FINRA, I plan on getting a draft of the Production Fund IV document drafts to you by month end- you can then review them and we can finalize the first week of March after everyone has given me input into the documents previously sent to you earlier this month. I also will get

92.     In fact, Krage & Janvey actually helped Plummer launch Salmon 2W, *one of the ventures for which Plummer has now been indicted*.

**From:** Mark Plummer [mailto:Mark@chestnutep.com]
**Sent:** Tuesday, March 03, 2015 2:40 PM
**To:** Ralph Janvey
**Cc:** Daniel Ramirez; John JB. Butrus; Bill Griffith; Laurie Tjosvold; Braden Tingle
**Subject:** Salmon 2W JV and the next Acquisition Fund

Ralph,

Hi!  Daniel is working on pre-prepping our next program to get over to you.  This is an 2 well program in-between the ET 1H JV and the ET 2H JV wells with the log results we have of the 2H.  We are calling it the "Salmon 2W JV" and Daniel is editing the information that he can before sending it to you.  The summary information is attached.  We decided to keep this program as a Deg D 506 B instead of a 506 C.

With the current low price of oil, I want to move ahead with another production fund as a 506 C blind pool.  Hopefully pick up properties while the prices are down and use the advertisements of the Fund to grow.  We want to make this just like the Production Fund IV LP without the dedicated Flint Oak PSA and with a $100,000,000 total offering and the same terms.  I want to call it the "Chestnut Opportunity Fund".  –

---

**From:** Daniel Ramirez [mailto:dramirez@chestnutexp.com]
**Sent:** Tuesday, January 12, 2016 7:09 PM
**To:** Valerie Thomas <vthomas@kjllp.com>
**Cc:** Raymond Kong <RKong@chestnutexp.com>
**Subject:** Salmon 2W JV - Texas E&P Drafts for Review

Valerie,

Attached for your review are redlined drafts for the Salmon 2W JV.  Primarily you will see company and Mark's name changes throughout.  Please let us know your comments.

Attachments:
CIM – Added to/changed Legal Proceedings.  Added a few notes to Risk Factors based on Opportunity Fund PPM.
Ex B, JV Agreement
Ex C, Sub Docs – Added to/changed similar to Opportunity Fund and 506(c) info.  Slightly changed third-party verification process.
Ex D, Turnkey Drilling
Ex E, Turnkey Completion
Ex G, AFE
Ex I, DD Process
Ex J, Balance Sheets – Removed audited balance sheets of Chestnut Exploration for FY 2011, 2012

93.     As demonstrated in the indictment and below, Plummer used this offering (that Krage &

Janvey helped Plummer launch) to steal over $4 million from unsuspecting investors:[32]

| DATE OF INVESTMENT | AMT OF INVESTMENT | DRILLING PROJECT |
|---|---|---|
| May 1, 2015 | $25,000.00 | Salmon 2W JV |
| May 8, 2015 | $50,000.00 | Salmon 2W JV |
| May 11, 2015 | $50,000.00 | Salmon 2W JV |
| May 13, 2015 | $25,000.00 | Salmon 2W JV |
| May 19, 2015 | $100,000.00 | Salmon 2W JV |
| May 19, 2015 | $50,000.00 | Salmon 2W JV |
| May 20, 2015 | $25,000.00 | Salmon 2W JV |

[32] *See* Ex. 1.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                    **PAGE 34**

| | | |
|---|---|---|
| May 20, 2015 | $25,000.00 | Salmon 2W JV |
| May 27, 2015 | $50,000.00 | Salmon 2W JV |
| May 27, 2015 | $25,000.00 | Salmon 2W JV |
| June 2, 2015 | $25,000.00 | Salmon 2W JV |
| June 4, 2015 | $25,000.00 | Salmon 2W JV |
| June 5, 2015 | $100,000.00 | Salmon 2W JV |
| June 11, 2015 | $300,000.00 | Salmon 2W JV |
| June 15, 2015 | $100,000.00 | Salmon 2W JV |
| July 14, 2015 | $50,000.00 | Salmon 2W JV |
| August 10, 2015 | $25,000.00 | Salmon 2W JV |
| August 26, 2015 | $100,000.00 | Salmon 2W JV |
| Oct. 9, 2015 | $50,000.00 | Salmon 2W JV |
| Nov. 24, 2015 | $50,000.00 | Salmon 2W JV |
| Dec. 22, 2015 | $100,000.00 | Salmon 2W JV |
| Jan. 26, 2016 | $50,000.00 | Salmon 2W JV |
| Feb. 5, 2016 | $25,000.00 | Salmon 2W JV |
| Feb. 22, 2016 | $50,000.00 | Salmon 2W JV |
| March 22, 2016 | $12,500.00 | Salmon 2W JV |
| April 5, 2016 | $400,000.00 | Salmon 2W JV |
| April 5, 2016 | $50,000.00 | Salmon 2W JV |
| April 28, 2016 | $25,000.00 | Salmon 2W JV |
| May 9, 2016 | $600,000.00 | Salmon 2W JV |
| May 11, 2016 | $100,000.00 | Salmon 2W JV |
| May 12, 2016 | $50,000.00 | Salmon 2W JV |
| May 13, 2016 | $50,000.00 | Salmon 2W JV |
| May 26, 2016 | $50,000.00 | Salmon 2W JV |
| June 8, 2016 | $50,000.00 | Salmon 2W JV |
| June 14, 2016 | $100,000.00 | Salmon 2W JV |
| June 14, 2016 | $50,000.00 | Salmon 2W JV |
| June 29, 2016 | $50,000.00 | Salmon 2W JV |
| July 14, 2016 | $100,000.00 | Salmon 2W JV |
| July 19, 2016 | $25,000.00 | Salmon 2W JV |
| July 26, 2016 | $25,000.00 | Salmon 2W JV |
| Sept. 13, 2016 | $37,500.00 | Salmon 2W JV |
| Sept. 16, 2016 | $75,000.00 | Salmon 2W JV |
| Sept. 22, 2016 | $18,750.00 | Salmon 2W JV |
| Sept. 26, 2016 | $18,750.00 | Salmon 2W JV |
| Sept. 28, 2016 | $37,500.00 | Salmon 2W JV |
| Oct. 5, 2016 | $25,000.00 | Salmon 2W JV |

**TRUSTEE'S FIRST AMENDED COMPLAINT**

| Oct. 17, 2016 | $25,000.00 | Salmon 2W JV |
|---|---|---|
| Dec. 9, 2016 | $11,875.00 | Salmon 2W JV |
| March 15, 2017 | $71,250.00 | Salmon 2W JV |
| March 17, 2017 | $47,500.00 | Salmon 2W JV |
| March 24, 2017 | $11,875.00 | Salmon 2W JV |
| March 24, 2017 | $23,750.00 | Salmon 2W JV |
| March 27, 2017 | $190,000.00 | Salmon 2W JV |
| March 28, 2017 | $285,000.00 | Salmon 2W JV |
| March 29, 2017 | $11,875.00 | Salmon 2W JV |
| March 29, 2017 | $23,750.00 | Salmon 2W JV |
| March 29, 2017 | $23,750.00 | Salmon 2W JV |
| March 31, 2017 | $23,750.00 | Salmon 2W JV |
| March 31, 2017 | $23,750.00 | Salmon 2W JV |
| March 31, 2017 | $23,750.00 | Salmon 2W JV |
| April 3, 2017 | $23,750.00 | Salmon 2W JV |
| April 5, 2017 | $47,500.00 | Salmon 2W JV |
| April 11, 2017 | $47,500.00 | Salmon 2W JV |
| April 11, 2017 | $23,750.00 | Salmon 2W JV |
| April 11, 2017 | $11,875.00 | Salmon 2W JV |
| April 18, 2017 | $23,750.00 | Salmon 2W JV |
| April 19, 2017 | $47,500.00 | Salmon 2W JV |
| April 21, 2017 | $47,500.00 | Salmon 2W JV |
| May 23, 2017 | $47,500.00 | Salmon 2W JV |

94.     On May 19, 2017, Krage & Janvey acknowledged that its work had kept "the wolves at bay" from Plummer and was the reason that Plummer should prioritize paying Krage & Janvey. Indeed, Janvey describes Plummer's stated plan to pay Krage & Janvey "out of production" as "being treated like an ordinary supply vendor" and, astutely, as a plan that will "only serve to continue to delay us getting paid."

the past few years. Please visit with him about this- I know it only becomes an issue when he gets his refinancing so you may want to wait until the bank is paid off but getting paid over the next three-four years was never our arrangement once he took out the bank.. His paying us out of production will only serve to continue to delay us getting paid. We are being treated like an ordinary supply vendor and I have more respect for you and our work than that. I do not think he appreciates that your work , as well as Paul's, is keeping the wolves at bay- especially now that the SEC has raised their head again.   By the way you received a 69 page fax this afternoon for a motion for summary judgment on an account. I gave it to Terri.  Thanks, Ralph

95.     Certainly, no one knew better than Krage & Janvey: (1) how unlikely it was for a supply vendor in the Ventures to receive money at that time; and (2) the emptiness of a promise from Plummer regarding production revenue.

### 3) Krage & Janvey's Conflicts of Interest

96.     On November 13, 2012, Janvey wrote an email to Plummer that epitomizes the conflict that Krage & Janvey had between Plummer and Debtor at all relevant times:

> your prepped. I am going to read your testimony and will have Caroline's transcript before then to help you get ready. 8-remember, I am always ready to help you in whatever way that I can. If there is something that I am not doing, or not doing enough, just let me know. My only goal as your lawyer is to try and help you achieve your business objectives while trying to protect you from liability on both the investor and regulatory front. You have always been a great client and I consider you a friend and care about you and your goals. Let us be smart and work together to make sure that you plan your business activities to achieve long-term objectives that are important to you and not react or over-react in a counter-productive way that may harm your long-term objectives. Thanks, Ralph

97.     As stated above, Krage & Janvey was fully aware that its representation of Plummer, individually, the Ventures, and its representation of Debtor were in conflict. However, Krage & Janvey did not obtain any waiver of conflict from Debtor—nor could it.

98.     Specifically, through representing Plummer, Debtor, and other entities in the Ventures, Krage & Janvey knew that:

- Debtor should have been fully reimbursed by investor funds for the operational costs that Debtor incurred on behalf of the Ventures;

- the investors/joint ventures (and/or the Managing Venturer, *e.g.*, Texas E&P Funding, Inc.) were legally responsible for such costs;

- Debtor was insolvent, constantly being sued for money owed to trade creditors, and always behind of Krage & Janvey's legal bills; and

- investors had, for a decade, accused Plummer of misappropriating investor funds (*i.e.*, funds that were to go to Debtor to pay Debtor's creditors).

99.     Nevertheless, Krage & Janvey never brought claims against Plummer or the investors/joint ventures to collect the funds to pay Debtor's creditors nor, upon information and belief, advised Plummer to do so. In addition, upon information and belief, Krage & Janvey never:

TRUSTEE'S FIRST AMENDED COMPLAINT                                                PAGE 37

- advised or recommended Debtor not to contract with the Ventures that were clearly not operating as intended;

- advised or recommended Debtor not to contract with service providers – now creditors – on behalf of the Ventures;

- advised Debtor of any rights it may have to seek the money from the joint ventures or pursuant to any of its contracts to pay Debtor's creditors; or

- advised or recommended Debtor seek reimbursement pursuant to its rights as the operator.

100.    Notably, on April 21, 2016, Krage & Janvey sent a letter to Plummer in connection with a regulatory enforcement action: (1) acknowledging its duties under the TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT; and (2) attempting to have Plummer (individually and on behalf of Debtor and Texas E&P Partners, Inc.) waive an advice of counsel defense and consent to the continued representation of Krage & Janvey "notwithstanding any currently existing conflicts of interest:"

> Dear Mark:
>
> You have requested that our law firm, Krage & Janvey, L.L.P., represent you individually and Texas E&P Partners, Inc. in FINRA disciplinary proceeding No. 2014040501801. Although Texas E&P Operating, Inc. is not a respondent in such proceeding, it joins in this agreement because its actions or inactions are at issue in the case.
>
> Our representation of clients is governed by the Texas Disciplinary Rules of Professional Conduct, as adopted by the Supreme Court of Texas and State Bar of Texas. As such, we must ensure that you understand your legal rights. We must also ensure that if a conflict exists which may adversely affect our independent professional judgment in your representation, we must evaluate any such conflict. To the extent any such conflict exists, you may nevertheless give informed consent to our continued representation. Alternatively, we may withdraw from representing you.
>
> I understand that on April 19, 2016, you testified under oath in FINRA disciplinary proceeding No. 2014040501801 that you received advice of counsel regarding your retention of completion funds for the undrilled well in the Chestnut 2007 4x4 Joint Venture. My partners, Mark Hendrix, Esq. and Valerie P. Thomas, Esq. later learned during confidential attorney-client communications that you recall receiving such advice many years ago from Ben L. Krage, Esq. of our firm. Mr. Krage does not recall giving any such advice. Nevertheless, if your recollection could provide you with a defense to liability or mitigating factor in sentencing due to advice of

> counsel in this (or any future) proceeding, we perceive there may be a conflict which must be resolved.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                    **PAGE 38**

101.    No such conflict waiver appears to have been signed then (or at any time previously) by Debtor.

102.    Instead, all actions Krage & Janvey took for Plummer subordinated Debtor's interest to Plummer's, resulting in the millions of dollars in creditor's claims in this Bankruptcy.

## VII.   RESERVATION

103.    Trustee's investigation is ongoing, and Trustee reserves the right to both supplement and/or amend his claims and this Amended Complaint.

## VIII.  CLAIMS

**A.     Count 1: Actual Fraudulent Transfer (TEX. BUS. & COMM. CODE § 24.005(a)(1) through 11 U.S.C. §§ 541 and 544)**

104.    Plaintiff incorporates all preceding paragraphs by reference, including but not limited to Sections VI(D) and (E), as if set forth fully herein.

105.    Plaintiff seeks to avoid the Transfers made to Krage & Janvey (as described above and in Ex. 2), which Debtor's creditors holding allowed unsecured claims could avoid under applicable state law pursuant to 11 U.S.C. § 544(b)(1).

106.    Pursuant to 11 U.S.C. § 541, Plaintiff seeks to avoid the Transfers Debtor could avoid under applicable state fraudulent transfer law. *See Janvey v. Brown*, 767 F.3d 430, 436-37 (5th Cir. 2014) (holding a receiver has standing to assert fraudulent conveyance claims for the entity in receivership once the principals who used the entity to conduct a fraudulent scheme are removed from control).

107.    The Transfers to Krage & Janvey could have been avoided under THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT ("TUFTA") § 24.005(a)(1) by numerous creditors, whose claims against Debtor arose before or within a reasonable time after the Transfers to Defendant, including but not limited to: Claim Nos. 30, 43, 50, 52, 80, 87, 91, 99, 100, and 154.

108. Debtor became a creditor once Plummer was removed from control over Debtor's assets and operations, and Plaintiff can avoid the Transfers on behalf of the estate under Bankruptcy Code § 541 and TUFTA § 24.005(a)(1).

109. Debtor made or authorized the Transfers, and Krage & Janvey, an insider, received the Transfers.

110. Debtor had an interest in the property transferred to Krage & Janvey.

111. The Transfers were made with the actual intent to hinder, delay, or defraud the investors and other creditors of Debtor, demonstrated by, among other things, the fact that:

- The Transfers consisted of monies obtained by Plummer through fraud;

- The Transfers occurred after Debtor was insolvent. Debtor was insolvent and financially unstable by 2013 through the Petition Date, which Krage & Janvey knew or should have known;

- Debtor and/or related entities were subject to over 50 lawsuits by creditors and investors during the relevant time period of the Transfers;

- Debtor was subject to multiple regulatory actions during the relevant time period of the Transfers;

- At the time of the Transfers, Debtor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business;

- The Transfers were paid to Krage & Janvey for services that Krage & Janvey provided to help *Plummer* perpetuate the Ventures/his fraud;

- At the time of the Transfers, Debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as they became due;

- At the time of the Transfers, Debtor was paying Krage & Janvey for "defense" of trade debt litigation, where it was clear that the money to pay Krage & Janvey was money that would not be available for the creditors in this inevitable Bankruptcy;

- The consideration received by Debtor for the Transfers to Krage & Janvey was less than reasonably equivalent in value because, among other things, the services were not for Debtor (or Debtor's benefit).

112.   As set forth in this Amended Complaint, Debtor did not receive value that was reasonably equivalent in the form of monies, policy positions, and other assets transferred to Krage & Janvey. Debtor paid for services that Krage & Janvey performed for Plummer and other entities in the Ventures, and none of Krage & Janvey's services to Debtor benefitted Debtor. Instead, Krage & Janvey charged Debtor to: (1) help Plummer continue the Ventures; and (2) assert baseless defenses and claims on behalf of Debtor, all of which only protected Plummer and his fraudulent Ventures at Debtor's expense.

113.   Therefore, pursuant to 11 U.S.C. §§ 541 and 544(b)(1), Plaintiff has the right to avoid the Transfers to Krage & Janvey under TEX. BUS. & COM. CODE § 24.005(a)(1) and should receive all of the Transfers.

**B.   Count 2: Constructive Fraudulent Transfer (TEX. BUS. & COMM. CODE § 24.005(a)(2) through 11 U.S.C. §§ 541 and 544)**

114.   Plaintiff incorporates all preceding paragraphs by reference, including but not limited to Sections VI(D) and (E), as if set forth fully herein.

115.   Pursuant to Bankruptcy Code § 544(b)(1), Plaintiff seeks to avoid the Transfers that Debtor's unsecured creditors could avoid under TUFTA § 24.005(a)(2).

116.   Debtor became a creditor once Plummer was removed from control over Debtor's assets and operations, and Plaintiff can avoid the Transfers on behalf of the estate under Bankruptcy Code § 541 and TUFTA § 24.005(a)(2).

117.   The Transfers to Krage & Janvey could have been avoided under TUFTA § 24.005(a)(2) by numerous creditors whose claims against Debtor arose before or within a reasonable time after the Transfers to Krage & Janvey, including but not limited to: Claim Nos. 30, 43, 50, 52, 80, 87, 91, 99, 100, and 154.

118.    Debtor made or authorized the Transfers, and Krage & Janvey, an insider, received the

Transfers.

119.    Debtor had an interest in the property transferred to Krage & Janvey.

120.    The Transfers to Krage & Janvey were fraudulent as to the investors and other creditors of

Debtor. As shown above, among other things:

- The Transfers consisted of monies obtained by Plummer through fraud;

- The Transfers occurred after Debtor was insolvent. Debtor was insolvent and financially unstable by 2013 through the Petition Date, which Krage & Janvey knew or should have known;

- Debtor and/or related entities were subject to over 50 lawsuits by creditors and investors during the relevant time period of the Transfers;

- Debtor was subject to multiple regulatory actions during the relevant time period of the Transfers;

- At the time of the Transfers, Debtor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business;

- The Transfers were paid to Krage & Janvey for services that Krage & Janvey provided to help *Plummer* perpetuate the Ventures/his fraud;

- At the time of the Transfers, Debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as they became due;

- At the time of the Transfers, Debtor was paying Krage & Janvey for "defense" of trade debt litigation, where it was clear that the money to pay Krage & Janvey was money that would not be available for the creditors in this inevitable Bankruptcy; and

- The consideration received by Debtor for the Transfers to Krage & Janvey was less than reasonably equivalent in value because, among other things, the services were not for Debtor (or Debtor's benefit).

121.    As set forth in this Amended Complaint, Debtor did not receive value that was reasonably

equivalent in the form of monies, policy positions, and other assets transferred to Krage & Janvey.

Debtor paid for services that Krage & Janvey performed for Plummer and other entities in the

Ventures, and none of Krage & Janvey's services to Debtor benefitted Debtor. Instead, Krage & Janvey charged Debtor to: (1) help Plummer continue the Ventures; and (2) assert baseless defenses and claims on behalf of Debtor, all of which only protected Plummer and his fraudulent Ventures at Debtor's expense.

122. Therefore, pursuant to 11 U.S.C. §§ 541 and 544(b)(1), Plaintiff has the right to avoid the Transfers to Krage & Janvey under TEX. BUS. & COM. CODE § 24.005(a)(2) and should recover all the Transfers.

**C.      Count 3: Actual Fraudulent Transfer (11 U.S.C. § 548(a)(1)(A))**

123. Plaintiff incorporates all preceding paragraphs by reference, including but not limited to Sections VI(D) and (E), as if set forth fully herein.

124. Pursuant to Bankruptcy Code § 548(a)(1)(A), Plaintiff seeks to avoid those payments within the Transfers that were made to Krage & Janvey within two years of the Petition Date (the "Section 548 Transfers").[33]

125. The claims of numerous creditors of Debtor arose before or within a reasonable time after the Section 548 Transfers to Krage & Janvey, including but not limited to: Claim Nos. 30, 43, 50, 52, 80, 87, 91, 99, 100, and 154.

126. Debtor made or authorized the Section 548 Transfers, and Krage & Janvey, an insider, received the Section 548 Transfers.

127. Debtor had an interest in the property transferred to Krage & Janvey.

128. The Section 548 Transfers were made to Krage & Janvey with actual intent to hinder, delay, or defraud Debtor's creditors as demonstrated by, among other things, that:

- The Section 548 Transfers consisted of monies obtained by Plummer through fraud;

---

[33] *See* Ex. 2.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                        **PAGE 43**

- The Section 548 Transfers occurred after Debtor was insolvent. Debtor was insolvent and financially unstable by 2013 through the Petition Date, which Krage & Janvey knew or should have known;

- Debtor and/or related entities were subject to over 50 lawsuits by creditors and investors during the relevant time period of the Section 548 Transfers;

- Debtor was subject to multiple regulatory actions during the relevant time period of the Section 548 Transfers;

- At the time of the Section 548 Transfers, Debtor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business;

- The Section 548 Transfers were paid to Krage & Janvey for services that Krage & Janvey provided to help *Plummer* perpetuate the Ventures/his fraud;

- At the time of the Section 548 Transfers, Debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as they became due;

- At the time of the Section 548 Transfers, Debtor was paying Krage & Janvey for "defense" of trade debt litigation, where it was clear that the money to pay Krage & Janvey was money that would not be available for the creditors in this inevitable Bankruptcy; and

- The consideration received by Debtor for the Section 548 Transfers to Krage & Janvey was less than reasonably equivalent in value because, among other things, the services were not for Debtor (or Debtor's benefit).

129.    As set forth in this Amended Complaint, Debtor did not receive value that was reasonably equivalent in the form of monies, policy positions, and other assets transferred to Krage & Janvey. Debtor paid for services that Krage & Janvey performed for Plummer and other entities in the Ventures, and none of Krage & Janvey's services to Debtor benefitted Debtor. Instead, Krage & Janvey charged Debtor to: (1) help Plummer continue the Ventures; and (2) assert baseless defenses and claims on behalf of Debtor, all of which only protected Plummer and his fraudulent Ventures at Debtor's expense.

130. Therefore, Plaintiff has the right to avoid the Section 548 Transfers to Krage & Janvey pursuant to 11 U.S.C. § 548(a)(1)(A), and the Section 548 Transfers should be avoided.

**D. Count 4: Constructive Fraudulent Transfer (11 U.S.C. § 548(a)(1)(B))**

131. Plaintiff incorporates all preceding paragraphs by reference, including but not limited to Sections VI(D) and (E), as if set forth fully herein.

132. Plaintiff seeks to avoid the Section 548 Transfers pursuant to Bankruptcy Code § 548(a)(1)(B).

133. The claims of numerous creditors of Debtor arose before or within a reasonable time after the Section 548 Transfers to Krage & Janvey, including but not limited to: Claim Nos. 30, 43, 50, 52, 80, 87, 91, 99, 100, and 154.

134. Debtor made or authorized the Section 548 Transfers, and Krage & Janvey, an insider, received the Section 548 Transfers.

135. Debtor had an interest in the Section 548 Transfers made to Krage & Janvey.

136. The Section 548 Transfers to Krage & Janvey were fraudulent as to the investors and other creditors of Debtor. As shown above, among other things:

- The Section 548 Transfers consisted of monies obtained by Plummer through fraud;

- The Section 548 Transfers occurred after Debtor was insolvent. Debtor was insolvent and financially unstable by 2013 through the Petition Date, which Krage & Janvey knew or should have known;

- Debtor and/or related entities were subject to over 50 lawsuits by creditors and investors during the relevant time period of the Section 548 Transfers;

- Debtor was subject to multiple regulatory actions during the relevant time period of the Section 548 Transfers;

- At the time of the Section 548 Transfers, Debtor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business;

- The Section 548 Transfers were paid to Krage & Janvey for services that Krage & Janvey provided to help *Plummer* perpetuate the Ventures/his fraud;

- At the time of the Section 548 Transfers, Debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as they became due;

- At the time of the Section 548 Transfers, Debtor was paying Krage & Janvey for "defense" of trade debt litigation, where it was clear that the money to pay Krage & Janvey was money that would not be available for the creditors in this inevitable Bankruptcy; and

- The consideration received by Debtor for the Section 548 Transfers to Krage & Janvey was less than reasonably equivalent in value because, among other things, the services were not for Debtor (or Debtor's benefit).

137. As set forth in this Amended Complaint, Debtor did not receive value that was reasonably equivalent in the form of monies, policy positions, and other assets transferred to Krage & Janvey. Debtor paid for services that Krage & Janvey performed for Plummer and other entities in the Ventures, and none of Krage & Janvey's services to Debtor benefitted Debtor. Instead, Krage & Janvey charged Debtor to: (1) help Plummer continue the Ventures; and (2) assert baseless defenses and claims on behalf of Debtor, all of which only protected Plummer and his fraudulent Ventures at Debtor's expense.

138. Therefore, Plaintiff has the right to avoid the Section 548 Transfers to Krage & Janvey pursuant to 11 U.S.C. § 548(a)(1)(B), and the Section 548 Transfers should be avoided.

**E.   Count 5: Preferences (11 U.S.C. § 547)**

139. Plaintiff incorporates all preceding paragraphs by reference, including but not limited to Sections VI(D) and (E), as if set forth fully herein.[34]

---

[34] For clarification and to the extent necessary, this count is pled in the alternative.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                      **PAGE 46**

140.   Pursuant to Bankruptcy Code § 547(b), Plaintiff seeks to avoid those payments within the Transfers that were made within 1 year of the Petition Date (the "Preference Transfers").[35]

141.   Debtor made or authorized the Preference Transfers, and Krage & Janvey, an insider, received the Preference Transfers.

142.   Debtor had an interest in the Preference Transfers at the time they were made.

143.   Such Preference Transfers were paid for or on account of an antecedent debt owed by Debtor before the Preference Transfers were made.

144.   The Preference Transfers were transferred to and for the benefit of Krage & Janvey.

145.   The Preference Transfers were made within the time limits prescribed by 11 U.S.C. § 547.

146.   As set forth above, Debtor was insolvent when the Preference Transfers were made to Krage & Janvey.

147.   Moreover, the Preference Transfers enabled Krage & Janvey to receive more than Krage & Janvey would have received under Chapter 7 of the Bankruptcy Code if these amounts had not been paid or if Krage & Janvey had been paid as provided in the Bankruptcy Code.

148.   Therefore, the Preference Transfers made to Krage & Janvey should be avoided pursuant to 11 U.S.C. § 547.

**F.     Count 6: Recovery of Avoided Transfers (11 U.S.C. § 550)**

149.   Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

150.   Krage & Janvey, an insider, was the initial transferee of the Transfers (including the Section 548 Transfers and Preference Transfers) alleged in Counts 1 through 5 of this Amended Complaint or the immediate or mediate transferee of the initial transferee.

---

[35] *See* Ex. 2.

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                          **PAGE 47**

151.    The value of the Transfers (including the Section 548 Transfers and Preference Transfers), to the extent they are avoided pursuant to Bankruptcy Code §§ 541, 544, 547, and/or 548, may be recovered by Plaintiff pursuant to Bankruptcy Code § 550.

**G.      Count 7: Money Had and Received / Unjust Enrichment**

152.    Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

153.    Krage & Janvey holds money (*i.e.*, the Transfers) which, in equity and good conscience, belongs to Debtor.

154.    From November 29, 2013 through November 28, 2017, Krage & Janvey wrongfully secured (or passively received) a monetary benefit from Debtor which would be unconscionable for  Krage & Janvey to retain. Krage & Janvey obtained this benefit by fraud, duress, or the taking of an undue advantage of Debtor.

155.    As shown in this Amended Complaint, if permitted to keep the Transfers from Debtor, Krage & Janvey would be unjustly enriched.

**H.      Count 8: Aiding and Abetting / Knowing Participation in Plummer's Breach of Fiduciary Duty to Debtor**

156.    Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

157.    At all relevant times, Plummer, who operated as a controlling officer and owner of Debtor, was a fiduciary of Debtor. As such, Plummer owed Debtor fiduciary duties, including the duty of loyalty and care. Krage & Janvey, through its representation of Plummer, Debtor, and the Ventures, was fully aware of Plummer's fiduciary role and fiduciary duties to Debtor.

158.    In addition to other breaches of fiduciary duty, Plummer breached his fiduciary duty to Debtor by: (1) causing Debtor to pay Krage & Janvey for legal services, even though Debtor was insolvent and was either harmed by (or did not receive reasonably equivalent value for) the legal

services; (2) using Debtor to implement fraud on investors; and (3) saddling Debtor with millions of dollars of debt that Debtor had no ability to repay.

159.    Plummer's breaches directly and proximately caused Debtor injury by, among other things: (1) causing the Bankruptcy of Debtor; and (2) depriving Debtor of the funds necessary to pay creditors. Plummer also enriched himself through his breaches of fiduciary duty to Debtor.

160.    Krage & Janvey had knowledge that Plummer was breaching his fiduciary duty to Debtor and intended to (and did) substantially encourage, assist, and participate with Plummer in his actions. For example, by 2013:

- Krage & Janvey knew or should have known Debtor was insolvent;

- Krage & Janvey knew Plummer was not operating Debtor as he should (and as he represented he was) in the Ventures;

- Krage & Janvey knew or should have known that Plummer was obtaining funds from investors fraudulently and was misappropriating funds that were to be used to pay Debtor's creditors; and

- Krage & Janvey knew or should have known that Plummer was using Debtor as a shell company to be on the hook for unrepayable debt in connection with Plummer's fraudulent and failing oil and gas Ventures.

161.    Krage & Janvey was aware that it was participating in a breach of Plummer's fiduciary duties to Debtor (or recklessly aided, abetted, or participated in same). Krage & Janvey had extensive knowledge of Debtor's insolvency and Plummer's Ventures, and Krage & Janvey willingly participated in assisting Plummer's efforts in piling unrepayable debt onto Debtor and perpetuating Plummer's fraud (which caused Debtor to incur additional debt). Indeed, Krage & Janvey charged Debtor for its services and for services rendered to Plummer and other non-Debtor entities, which were not in Debtor's best interest and directly harmed Debtor.

162.    At all relevant times, Krage & Janvey, in order to aid Plummer, acted:

- in conflict with (or in disregard of) its duty to Debtor;

TRUSTEE'S FIRST AMENDED COMPLAINT                                    PAGE 49

- to ignore clear conflicts of interests and prioritize Plummer's interests over Debtor's, allowing Debtor to incur millions in unrepayable debt and not exercising Debtor's rights to reimbursement so that Plummer could continue his fraudulent business activity;

- to cloak Plummer's fraudulent scheme with the appearance of legitimacy;

- to help Plummer evade federal prosecution and enforcement from regulatory authorities; and

- to obtain financial benefit from defending civil actions filed against Debtor and other entities in the Ventures, as well as enforcement actions.

163.   Krage & Janvey's services and substantial assistance to Plummer were essential to the success of Plummer's fraud and the liabilities to Debtor that ultimately accompanied Plummer's breaches of fiduciary duty to Debtor.

164.   Krage & Janvey also contributed to the liabilities of Debtor's Bankruptcy Estate. Specifically, through representing Plummer, Debtor, and other entities in the Ventures in various lawsuits and regulatory proceedings, Krage & Janvey knew that:

- Plummer raised money from investors/joint ventures;

- The investors/joint ventures and/or Managing Venturer were responsible for development costs;

- Debtor did not have funds to pay costs that Debtor incurred to drill and operate various oil and gas wells; and

- Investors/joint ventures had accused Plummer of misappropriating investor funds (*i.e.*, funds that were supposed to go to Debtor to pay Debtor's creditors).

165.   Nonetheless, Krage & Janvey did not take any steps to protect Debtor and mitigate its harm. Instead of representing Debtor's interests, Krage & Janvey took all actions to effectuate *Plummer's* interests, including in the referenced litigation and enforcement proceedings. Krage & Janvey, through action and omission, aided and abetted Plummer in using Debtor as a scapegoat to incur

unrepayable operational debt so that Plummer could continue fraudulent fundraising in the Ventures.

166. Krage & Janvey's conduct was a substantial factor in effectuating Plummer's breach of fiduciary duty (and the benefits that Plummer received as a result) and causing the damage that Debtor sustained as a result of Plummer's breach of fiduciary duty. As a result of Krage & Janvey's participation, Plummer was able to improperly saddle Debtor with debt in this Bankruptcy, as well as divert funds from Debtor in connection with his fraud. This harmed Debtor's ability to pay its creditors and resulted in Debtor's Bankruptcy.

167. As a result of the above facts, Krage & Janvey knew or should have known that its aiding, abetting, or participation in the breaches of fiduciary duties would result in harm to Debtor. Plaintiff seeks to recover the damages to Debtor, which were directly and proximately caused by Krage & Janvey's above-described knowing participation, assistance, and encouragement in Plummer's breach of fiduciary duty.

168. Moreover, Trustee is entitled to recover exemplary damages.

**I.      Count 9: Professional Negligence/Malpractice**

169. Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

170. This claim arises out of Krage & Janvey's role as attorney for Debtor, for which Debtor paid Krage & Janvey.

171. As Debtor's attorney, Krage & Janvey owed a duty to Debtor. Krage & Janvey provided legal services to Debtor and acted as a general counsel to Plummer in connection with his operation of the Ventures.

172. As Debtor's attorney, Krage & Janvey had a duty to protect Debtor from liability in every possible way. Krage & Janvey was required to use the skill, prudence, and diligence commonly exercised by practitioners of its profession in discharging this duty.

173. Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct ("TDRPC") prohibits a lawyer from representing a person if the representation of that person involves a substantially related matter in which that person's interests are "materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm," unless the lawyer "reasonably believes the representation of each client will not be materially affected" and "each affected or potentially affected client consents to such representation after full disclosure." In addition to requiring compliance with the rule for co-defendants in litigation, the comments require that a lawyer who is paid from a source other than the client must obtain the consent of the client.[36] Moreover, regardless of consent, the comments prohibit such a payment arrangement if it compromises the lawyer's duty of loyalty to the client.[37]

174. Where, as here, a lawyer represents co-defendants in litigation, he must comply with the TDRCP, which requires the lawyer to advise the clients regarding potential conflicts and obtain a waiver before proceeding. Krage & Janvey failed to do so. Krage & Janvey's joint representation and division of loyalties between Debtor (on the one hand) and Plummer and other entities in the Ventures (on the other hand) prevented Krage & Janvey from adequately advising each of the entities regarding potential claims and/or defenses including potential claims among the parties themselves arising from contracts between them or from common law.

175. In addition, TDRCP Rule 1.12(b) requires that "[a] lawyer representing an organization must make reasonable remedial actions whenever the lawyer learns or knows that: (1) an officer, employee, or other person associated with the organization has committed or intends to commit a violation of a legal obligation to the organization or a violation of the law which reasonably might

---

[36] *See* TDRPC Rule 1.06, cmt. 12 ("A lawyer may be paid from a source other than the client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty to the client.").
[37] *Id.*

be imputed to the organization; (2) the violation is likely to result in substantial injury to the organization; and (3) the violation is related to a matter within the scope of the lawyer's representation of the organization."

176. A lawyer is also obligated to attempt to dissuade a client from committing a criminal or fraudulent act. TDRCP Rule 1.02 (d) provides that "[w]hen a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in substantial injury to the financial interests or property of another, the lawyer shall promptly make reasonable efforts under the circumstances to dissuade the client from committing the crime or fraud."

177. Under its professional obligations, Krage & Janvey was required to:

- shield Debtor from liability stemming from known wrongdoing, and to avoid rendering assistance to Debtor in violation of the law;

- advise Debtor of the legality of its actions, its rights and its obligations;

- to take appropriate action to advise Debtor and to help it avoid wrongdoing that could seriously harm the company; and

- where it believed the management of a corporation was committing serious regulatory violations, to actively discuss the violative conduct, urge cessation of the activity, and withdraw from representation where the firm's legal services may contribute to the continuation of such conduct.

178. Krage & Janvey subordinated the interests of Debtor to those of other clients, Plummer and other entities in the Ventures, in order to ensure continued receipt of business from Plummer and legal fees from Debtor. Through the provision of legal services to Plummer and other entities in the Ventures, Krage & Janvey breached its duty to Debtor by:

- failing to assert (or advise Debtor to assert) Debtor's rights to reimbursement on operational costs or to obtain funds from the joint ventures that were responsible for funding Debtor to pay vendors, which also caused Debtor to continue to collect and incur unrepayable debt;

**TRUSTEE'S FIRST AMENDED COMPLAINT**                                                                            **PAGE 53**

- working to place ultimate liability for the Ventures' debt on Debtor's shoulders and taking steps to protect other entities in the Ventures – including the joint ventures – from being responsible for the debt (*e.g.*, adding other parties to lawsuits);

- assisting Plummer's continuing efforts to sell securities while avoiding regulation, which also caused Debtor to continue to collect and incur unrepayable debt;

- assisting in the provision of false and misleading materials for investors, which also caused Debtor to continue to collect unrepayable debt;

- failing to dissuade Plummer from committing fraud (and using Debtor in the commission of his fraud), which also caused Debtor to continue to collect and incur unrepayable debt; and

- being paid by Debtor to defend Plummer's fraud, including fraud on the Debtor, at Debtor's expense.

179. Krage & Janvey's breach of its duty to Debtor proximately caused Debtor's injuries. The Debtor relied upon Krage & Janvey, and Krage & Janvey's negligence was a substantial factor in bringing about Debtor's injuries, without which no harm would have been incurred.

180. Krage & Janvey should have anticipated the dangers that its negligent conduct created for Debtor. Krage & Janvey's legal services contributed to the size and scope of Plummer's fraud, which resulted in Debtor's financial ruin and the scope of the claims against Debtor in this Bankruptcy.

181. Debtor sustained damages. As a result of Krage & Janvey's negligence, Plummer was able to improperly saddle Debtor with debt, as well as divert funds from Debtor in connection with his fraud. This harmed Debtor's ability to pay its creditors and resulted in Debtor's bankruptcy.

**J.** **Count 10: Negligent Retention/Supervision**

182. Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

183. This claim arises out of Krage & Janvey's role as attorney for Debtor, for which Debtor paid Krage & Janvey.

184.     Krage & Janvey owed a duty to Debtor to use ordinary care in the hiring, supervision, and retention of their agents and employees in the monitoring the activities of their employees in representing Debtor.

185.     Krage & Janvey knew or should have known that Plummer had retained its employees for the specific purpose of helping Plummer evade federal oversight and regulation, execute and maintain the Ventures, and to use Debtor as a debt scapegoat.

186.     Krage & Janvey's failure to investigate, screen, or supervise its employees proximately caused the injuries to Debtor.

187.     As a result of Krage & Janvey's negligence, Plummer was able to improperly saddle Debtor with debt, as well as divert funds from Debtor in connection with Ventures. This harmed Debtor's ability to pay its creditors and resulted in Debtor's bankruptcy.

**K.     Disallowance of Claims (11 U.S.C. §§ 502(b) and (d))**

188.     Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

189.     On February 6, 2018, Krage & Janvey filed a proof of claim (Claim No. 102) in this Bankruptcy in the amount of $682,643.31.

190.     On April 25, 2019, Krage & Janvey filed what appears to be an amended claim (Claim No. 155 and together with Claim No. 102, the "Krage & Janvey Claim"). The basis for the Krage & Janvey Claim is unpaid legal fees.

191.     The Krage & Janvey Claim should be disallowed because it is a claim for legal fees for services primarily provided to Plummer and other entities, not the Debtor, and which harmed Debtor.

192.     Further, Krage & Janvey has not paid the amount, or turned over such property for which it is liable under Bankruptcy Code § 550(a).

193.    Pursuant to Bankruptcy Code § 502(d), to the extent Krage & Janvey obtains an allowed claim against Debtor, such claim should be disallowed unless and until Krage & Janvey repays in full to Plaintiff, pursuant to judgment or otherwise, the amount of such Transfers.

## IX.    RESPONDEAT SUPERIOR

194.    Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

195.    Krage & Janvey is responsible for the tortious acts of their attorneys (the "Attorneys") who worked on matters for Debtor, Plummer, and other entities in the Ventures. At all relevant times that the Attorneys were representing Debtor, Plummer, and other entities in the Ventures, they were employed by Krage & Janvey.

196.    When representing Debtor, Plummer, and other entities in the Ventures (and when they engaged in the wrongful conduct described herein), the Attorneys were acting in the course and scope of their employment at Krage & Janvey and in furtherance of the law firm's business.

## X.    DISCOVERY RULE, TOLLING, AND RELATION BACK

197.    Plaintiff incorporates all preceding paragraphs by reference, including but not limited to Section V, as if set forth fully herein.

198.    Plaintiff also incorporates by reference his *Motion for Leave to Amend*, filed October 12, 2022 [Adv. DE # 27], his *Reply in Support of the Motion for Leave to Amend*, filed November 18, 2022 [Adv. DE # 35], and the Court's December 6, 2022 *Order Granting the Motion for Leave to Amend* [Adv. DE # 39], as if set forth fully herein.

199.    Debtor filed for bankruptcy on November 29, 2017.

200.    The original Trustee died unexpectedly in January of 2019. Trustee was appointed as successor trustee on January 23, 2019 and brought this Adversary Proceeding against Krage & Janvey on November 27, 2019, seeking to avoid the Transfers and disallow Krage & Janvey's claim.

201. As stated above, the parties agreed to a scheduling order at the beginning of the pandemic in March 2020. Following that, the parties agreed to a number of amendments to the scheduling order (and then abatements) to account for both: (1) the effect of the pandemic on the progress of this case; and (2) the desire for the parties to pursue settlement discussions. As a result, this matter, and all its deadlines, were all pushed back and then abated until *August 31, 2022*. Ultimately, the parties' settlement discussions reached an impasse at the close of the last abatement period.

202. As it relates to any limitations defense asserted by Krage & Janvey, the discovery rule and equitable tolling principles should apply to any applicable limitations period in this action. *See e.g. HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) (holding the discovery rule shifts the date of the "legal injury" from the time the wrongful action occurred to the time when "[plaintiff] knew or, exercising reasonable diligence, should have known of the facts giving rise to a cause of action"). Plaintiff was not able to discover the facts giving rise to the various state law claims until Plaintiff was able to review Debtor's legal files that were solely maintained at Krage & Janvey's offices. Due to the pandemic and Krage & Janvey's unwillingness to provide electronic copies of the legal files, Plaintiff did not discover (and could not discover) the state law claims until June 2021.

203. Moreover, including for the reasons stated in Trustee's *Motion for Leave to Amend*, this Amended Complaint relates back to the filing of the Original Complaint because the claims in the Amended Complaint arise out of the same operative facts as the claims in the Original Complaint, namely Krage & Janvey's representation of the Debtor, Plummer, and the Ventures.

## XI. ACTUAL DAMAGES

204. Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

205. Debtor has suffered losses in the millions that were proximately caused by Krage & Janvey's wrongful conduct described herein.

### XII.   PUNITIVE DAMAGES

206.   Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

207.   The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of TEX. CIV. PRAC. & REM. CODE § 41.003.

208.   Plaintiff is entitled to recover punitive damages in an amount necessary to punish Krage & Janvey and to deter similar conduct of others in the future.

### XIII.   ATTORNEYS' FEES

209.   Plaintiff incorporates all preceding paragraphs by reference, as if set forth fully herein.

210.   Plaintiff is entitled to recover reasonable and necessary attorneys' fees and costs for his claims against Krage & Janvey, including under applicable fraudulent transfer law. *See* TEX. BUS. & COMM. CODE § 24.013.

### XIV.   CONCLUSION AND PRAYER

WHEREFORE, Trustee respectfully requests that Krage & Janvey be ordered to return the Transfers to Debtor's estate and that the Court enter judgment in favor of Trustee and this Bankruptcy Estate against Krage & Janvey for all claims and causes of action set forth herein, awarding all damages plus the maximum allowable interest, exemplary damages, attorneys' fees and costs, and pre- and post-judgment interest. Trustee further requests a constructive trust on Krage & Janvey's spending, if any, of the funds at issue. Trustee further requests the Court award Trustee all other and further relief, both general and specific, to which Trustee may be entitled.

DATED: December 9, 2022

Respectfully submitted,

CRAWFORD, WISHNEW & LANG, PLLC

*/s/ Michael J. Lang*
**Michael J. Lang**
Texas State Bar No. 24036944
Email: mlang@cwl.law
**Alexandra J. Ohlinger**
Texas State Bar No. 24091423
Email: aohlinger@cwl.law
1700 Pacific Avenue, Suite 2390
Dallas, Texas 75201
Telephone: 214.817.4500
Facsimile: 214.817.4509

***Attorneys for Ch. 7 Trustee
Robert Yaquinto, Jr.***

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 9, 2022, a true and correct copy of this Motion was served on all counsel of record via the Court's e-file system.

*/s/ Michael J. Lang*
Michael J. Lang